## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

IN RE:                                    )
                                          )        Case No. 17-32406
CC CARE, LLC, *et al.*,                   )        Chapter 11
                                          )        (Jointly Administered)
                                          )        Hon. Janet S. Baer
            *Debtors/Debtors-in-Possession.*      )
_____   )
                                          )

## CERTIFICATE OF SERVICE

The undersigned, being first duly sworn on oath deposes and states that he caused a copy of the foregoing **Notice of Final Hearing on Debtors' Motion For Authority to Use Cash Collateral and For Related Relief and For Authority to Obtain Subordinate Secure Financing to Cover Certain Potential Cash Shortfalls and For Related Relief** to be served via the Court's Electronic Filing System (ECF), to all parties entitled to receive such notice, and via U.S. Mail, on the 17th day of January 2019.

                              /s/David K. Welch
                              Burke, Warren, MacKay & Serritella, P.C.
                              330 N. Wabash, 21st Floor
                              Chicago, Illinois 60611
                              (312) 840-7000

**DEBTORS' COUNSEL**:
David K. Welch, Esq. (Atty. No. 06183621)
Brian P. Welch (Atty. No. 6307292)
Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash Ave., Suite 2100
Chicago, IL 60611
TEL: (312) 840-7000  FAX: (312) 840-7900

## SERVICE LIST

**Via ECF**:

David Paul Holtkamp, David.Holtkamp2@cityofchicago.org
Lauren Newman, lnewman@thompsoncoburn.com
Michael L. Gesas, Michael.gesas@saul.com
Kevin H. Morse, kevin.morse@saul.com
Devon J. Eggert, deggert@freeborn.com
Craig E. Reimer, CReimer@mayerbrown.com
Hannah Arenstam, harenstam@vedderprice.om
Michael M. Eidelman, meidelman@vedderprice.com
Jeffrey M. Schwartz, jschwartz@muchshelist.com
Phillip A. Martin, pmartin@fmhd.com
Richard A. Saldinger, rsaldinger@llflegal.com
L. Katie Mason, kmason@reinhartlaw.com
Michael Kelly, Michael.kelly@usdoj.gov
Debra Devassy Babu, ddevassy@askounisdarcy.com
Thomas J. Angell, tangell@jbosh.com
Tiffany E. Alberty, talberty@malmanlaw.com
Keith Allen, kallem@mandellmenkes.com
Sukrat A. Baber, sbaber@ohaganmeyer.com
John A. Benson, Jr., jbenson@huckbouma.com
Candace Clark, cclark@clarkhill.com
Bruce Dopke, bdopke@stahlcowen.com
Erin Doyle, edoyle@kjs-law.com
Josiah A. Groff, efile@laboradvocates.com
Joshua Gross, jgross@mayerbrown.com
Elizabeth Janczak, ejanczak@freeborn.com
Thomas Kiriakos, tkiriakos@mayerbrown.com
Thomas J. Lester, tlester@hinshawlaw.com
Robert Lynch, III, Robertlynch2@illinois.gov
Aaron G. McCollough, amccollough@mcguirewoods.com
Elizabeth Rowe, efile@laboradvocates.com
Scott Schreiber, sschreiber@clarkhill.com
Samuel C. Wisotzkey, swisotzkey@kmksc.com
James S. Zmuda, jzmuda@califf.com
Jeffrey C. Wisler, jwisler@connollygallaher.com

**Via U.S. Mail**:

Brad Boe
Performance Food Group, Inc.
8001 TPC Road
Rock Island, IL 61204

Janis Jones
ONR National, Speech Pathology, Inc.
1101 S. Capital of Texas Hwy., Bldg. G200
Austin, TX 78746

Pat Comstock
Illinois Council On Long Term Care
203 N. LaSalle St., Suite 2100
Chicago, IL 60601

Nancy Jennings
ReHabCare Group East, Inc.
7733 Forsyth Blvd., Suite 1700
St. Louis, MO 63105

Dick Krause
Pharmore Drugs, LLC
3412 W. Touhy Ave.
Skokie, IL 60076

Donald Torres
Medline Industries, Inc.
Three Lakes Drive
Northfield, IL 60093

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | Case No. 17-32406 |
|  | ) | Chapter 11 |
| CC CARE, LLC *et al.*, | ) | (Jointly Administered) |
|  | ) | Judge Janet S. Baer |
| Debtors/Debtors-in-Possession. | ) |  |

### NOTICE OF FINAL HEARING ON DEBTORS' MOTIONS FOR AUTHORITY TO USE CASH COLLATERAL AND FOR RELATED RELIEF AND FOR AUTHORITY TO OBTAIN SUBORDINATE SECURED FINANCING TO COVER CERTAIN POTENTIAL CASH SHORTFALLS AND FOR RELATED RELIEF

PLEASE TAKE NOTICE that a Final Hearing on the Motions of CC Care, LLC, et al.,

Debtors and Debtors in Possession herein, for Authority to Use Cash Collateral and For Related

Relief and for Authority to Obtain Subordinate Secured Financing to Cover Certain Potential Cash

Shortfalls and For Related Relief is scheduled before the Honorable Janet S. Baer, 219 South

Dearborn Street, Dirksen Federal Building, courtroom 615, for **February 7, 2019** at **1:00 p.m.**

Objections, if any, shall be in writing and filed with the Clerk of the Bankruptcy Court by the close

of business on **January 30, 2019**. Copies of any such objections shall be properly served upon

the following persons as well as any and all Counsel having appeared in these Chapter 11 cases:

David K. Welch, Esq.
Burke, Warren MacKay
& Serritella, P.C.
333 N. Wabash, 21st Fl.
Chicago, IL 60611

Michael Eidelman, Esq.
Vedder Price, PC
222 N. LaSalle St., #2600
Chicago, IL 60601

Devon J. Eggert, Esq.
Freeborn & Peters LLP
311 S. Wacker Dr., #3000
Chicago, IL 60606

United States Trustee
219 S. Dearborn St.
Chicago, IL 60604
**Attn: Denise DeLaurent**

Craig E. Reimer
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

Kevin Morse
Saul, Ewing, Arnstein & Lehr,
LLP
161 N. Clark St., Suite 4200
Chicago, IL 60601

Lauren Newman
Thompson & Coburn LLP
55 E. Monroe St., 37th Floor
Chicago, IL 60603

Attached as **Exhibits A** and **B** to this Notice of Final Hearing are copies of the Nineteenth Agreed Interim Order Authorizing Use of Cash Collateral and Granting Related Relief and the Interim Order (I) Authorizing Debtor to Obtain Secured Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code and (II) Scheduling a Final Hearing, entered by the Court on January 17, 2019.

Date: January 17, 2019

**DEBTORS' COUNSEL:**
David K. Welch (Atty. No. 06183621)
Brian P. Welch (Atty. No. 6307292)
Burke, Warren, MacKay & Serritella, P.C.
330 N. Wabash, Suite 2100
Chicago, Illinois 60611
Tel: (312) 840-7000 – Fax: (312) 840-7900

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CC Care, LLC, *et al.*[1] | Case No. 17-32406 |
| Debtors. | Judge Janet S. Baer |
| | (Jointly Administered) |

**NINETEENTH AGREED INTERIM ORDER (I) AUTHORIZING USE OF
CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363,
(II) GRANTING ADEQUATE PROTECTION PURSUANT TO
11 U.S.C. §§ 361 AND 363, (III) SCHEDULING HEARING TO CONSIDER
ENTRY OF A FINAL ORDER, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of CC Care, LLC and its related affiliates (collectively, the "Debtors") (a) seeking this Court's authorization pursuant to §363(c) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and Rule 4001-2 of the Local Bankruptcy Rules for the Northern District of Illinois ("Local Rules"), for the Debtors to, inter alia, use "Cash Collateral" (as defined below) on an interim and final basis and, pursuant to Bankruptcy Code §§ 361 and 363(e), provide adequate protection to the Prepetition Agent, the AR Lenders (as those terms are defined below), the United States Department of Housing and Urban Development ("HUD") and Edward Don & Company ("Edward Don") with respect to any diminution in the value of the Prepetition Agent's, the AR Lenders', HUD's or Edward Don's interest in the Cash Collateral resulting from (i) the use of Cash Collateral, (ii) the use, sale or lease of other "Collateral" (as defined below) (other than Cash Collateral) and (iii) the imposition of the

---

[1] The Debtors in these Chapter 11 Cases are: CC Care, LLC (Case No.: 17-32406), BT Bourbonnais Care, LLC (Case No.: 17-32411), CT Care, LLC (Case No.: 17-32417), FT Care, LLC (Case No.: 17-32423), JT Care, LLC (Case No.: 17-32425), KT Care, LLC (Case No.: 17-32427), SV Care, LLC (Case No.: 17-32430), TN Care, LLC (Case No.: 17-32429), WCT Care, LLC (Case No.: 17-32433), JLM Financial Healthcare, LP (Case No.: 17-32421).

automatic stay pursuant to Bankruptcy Code § 362(a); (b) seeking a preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001; and (c) requesting that a final hearing (the "Final Hearing") be scheduled, and that notice procedures in respect of the Final Hearing be established by this Court to consider entry of a Final Order (defined below) authorizing on a final basis, inter alia, the use of Cash Collateral; the initial Preliminary Hearing having been held before this Court on November 2, 2017, at the conclusion of which the Court entered that certain *Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 20]; the second Preliminary Hearing having been held before this Court on November 16, 2017, at the conclusion of which the Court entered that certain *Second Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 53]; the third Preliminary Hearing having been held before this Court on November 30, 2017, at the conclusion of which the Court entered that certain *Third Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 72]; the fourth Preliminary Hearing having been held before this Court on December 22, 2017, at the conclusion of which the Court entered that certain *Fourth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 107]; the fifth Preliminary Hearing having been held before this Court on January 18, 2018, at the conclusion of which the Court entered that certain *Fifth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate*

*Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 116];

the sixth Preliminary Hearing having been held before this Court on February 6, 2018, at the

conclusion of which the Court entered that certain *Sixth Agreed Interim Order (I) Authorizing Use*

*of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11*

*U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 142]; the seventh Preliminary

Hearing having been held before this Court on February 28, 2018, at the conclusion of which the

Court entered that certain *Seventh Agreed Interim Order (I) Authorizing Use of Cash Collateral*

*Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and*

*363, and (III) Granting Related Relief* [Dkt. No. 164]; the eighth Preliminary Hearing having been

held before this Court on March 12, 2018, at the conclusion of which the Court entered that certain

*Eighth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363,*

*(II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting*

*Related Relief* [Dkt. No. 175]; the ninth Preliminary Hearing having been held before this Court

on March 29, 2018, at the conclusion of which the Court entered that certain *Ninth Agreed Interim*

*Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate*

*Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 189];

the tenth Preliminary Hearing having been held before this Court on April 26, 2018, at the

conclusion of which the Court entered that certain *Tenth Agreed Interim Order (I) Authorizing Use*

*of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11*

*U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 251]; the eleventh Preliminary

Hearing having been held before this Court on May 24, 2018, at the conclusion of which the Court

entered that certain *Eleventh Agreed Interim Order (I) Authorizing Use of Cash Collateral*

*Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and*

*363, and (III) Granting Related Relief* [Dkt. No. 281]; the twelfth Preliminary Hearing having been held before this Court on June 28, 2018, at the conclusion of which the Court entered that certain *Twelfth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 298]; the thirteenth Preliminary Hearing having been held before this Court on September 25, 2018, at the conclusion of which the Court entered that certain *Thirteenth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 351]; the fourteenth Preliminary Hearing having been held before this Court on October 24, 2018, at the conclusion of which the Court entered that certain *Fourteenth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 373]; the fifteenth Preliminary Hearing having been held before this Court on November 6, 2018, at the conclusion of which the Court entered that certain *Fifteenth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 380]; the sixteenth Preliminary Hearing having been held before this Court on November 20, 2018, at the conclusion of which the Court entered that certain *Sixteenth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 387]; the seventeenth Preliminary Hearing having been held before this Court on December 11, 2018, at the conclusion of which the Court entered that certain *Seventeenth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate*

CHICAGO/#3246332.1

*Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 397];

the eighteenth Preliminary Hearing having been held before this Court on December 11, 2018, at

the conclusion of which the Court entered that certain *Eighteenth Agreed Interim Order*

*(I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate*

*Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief* [Dkt. No. 415]

(collectively, the "Interim Order"); due and sufficient notice of the Motion and the Preliminary

Hearing having been given; copies of the Interim Order having been served upon the Notice Parties

(defined below) in accordance with the terms thereof; and upon the entire record made at the

Preliminary Hearing, and this Court having found good and sufficient cause appearing therefor,

SUBJECT TO THE STATUTORY COMMITTEE'S AND OTHER PARTIES-IN-

INTEREST'S RIGHTS UNDER ¶20 HEREOF, THE PARTIES HERETO STIPULATE THAT:

A.      On October 30, 2017 (the "Petition Date"), each of the Debtors filed voluntary

petitions for relief with this Court under Chapter 11 of the Bankruptcy Code (this "Chapter 11

Cases").

B.      The Debtors are continuing in the management and operation of their businesses

and properties as Debtors in possession pursuant to §§1107 and 1108 of the Bankruptcy Code. No

trustee or examiner has been appointed in the Chapter 11 Cases.

C.      This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over the

Chapter 11 Cases, and over the persons and property affected hereby. Consideration of the Motion

constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and

proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

CHICAGO/#3246332.1

D.     The United States Trustee appointed an official committee of unsecured creditors in the Chapter 11 Cases pursuant to §1102 of the Bankruptcy Code (the "Statutory Committee") on November 15, 2017.

E.     On or about September 4, 2018, in each of the Chapter 11 Cases, Laureate Mortgage, LLC ("LML") filed a notice that pursuant to Fed. R. Bank. P. 3001(e)(2) (collectively, the "LML Rule 3001(e) Notices") that pursuant to the terms of an Assignment and Assumption Agreement dated August 29, 2018 pertaining to each one of the Debtors, HUD transferred and assigned to LML all of HUD's right, title and interest in and to all of the proof of claims it has filed in these chapter 11 cases (collectively, the "Proofs of Claim") and all of the collateral documents it has with the Debtors (collectively, the "Assigned Claims"), except for any claims, defense and allegations existing or arising, in whole or part, from the HUD Regulatory Agreements referenced in such Proofs of Claim unless and until HUD withdraws any such claims (the "Retained Regulatory Claims").  Shortly thereafter, on or about September 6, 2018, Laureate Ltd. ("Laureate") filed similar notices under Fed. R. Bank. P. Rule 3001(e) in each of the Chapter 11 Cases to provide notice and evidence the further transfer of the Assigned Claims from LML to Laureate.  To date no objection has been filed with respect to any of the notices of transfer filed by either LML or Laureate in these Chapter 11 Cases.  As a result of the foregoing, various references to HUD below that have been made in prior Interim Orders are now being made to Laureate as successor in interest to HUD with respect to such matters, as further addressed below.

F.     After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in ¶20 herein, the Debtors (on behalf of themselves and their estates) admit, stipulate, acknowledge and agree (collectively, the "Debtors' Stipulations") that:

(i)    *Prepetition Credit Agreement.*  Pursuant to that certain Credit and Security Agreement dated as of July 3, 2012 (as amended, modified or otherwise supplemented from time to time, the "Prepetition Credit Agreement" and together with all other documents executed in connection therewith, the "Prepetition Credit Documents"), among the Debtors (exclusive of JLM Financial Healthcare, LP ("JLM")) (collectively, the "Operating Debtors"), SH Care, LLC (a non-debtor affiliate), the lenders party thereto from time to time (collectively, the "AR Lenders"), and MidCap Funding IV Trust (f/k/a MidCap Funding IV, LLC), as assignee of MidCap Financial Trust (f/k/a MidCap Financial, LLC) and successor administrative agent (the "Prepetition Agent"), the AR Lenders extended certain loans and other accommodations to the Operating Debtors on the terms set forth therein.  Pursuant to that certain Payment Guaranty, dated as of July 3, 2012, JLM and JLM Financial Investments 13, LLC, a Texas limited liability company guaranteed the payment and performance of the AR Lenders' Prepetition Obligations (as defined below).

(ii)    *AR Lenders' Prepetition Obligations.*  As of the Petition Date, the AR Lenders assert that they were owed $8,390,987.49 in revolving loan principal obligations, plus interest, fees, costs and expenses and all other "Obligations" under and as defined in the Prepetition Credit Agreement (collectively, the "AR Lenders' Prepetition Obligations").

(iii)    *Collateral for the AR Lenders' Prepetition Obligations.*  The AR Lenders' Prepetition Obligations are secured by perfected liens and security interests (the "Prepetition Liens") in substantially all of the existing and after acquired assets of the Operating Debtors excluding the Excluded Collateral (as that term is defined in the Intercreditor Agreement (defined herein)) (such non-Excluded Collateral, together with

collateral granted or pledged to the Prepetition Agent by any other party, shall collectively be referred to as the "AR Lenders' Collateral"). As set forth in greater detail in the Intercreditor Agreement, the Prepetition Agent holds (A) senior prepetition liens on AR Lender Priority Collateral (as defined in that certain Amended and Restated Intercreditor Agreement and Rider thereto dated as of September 27, 2012 by and among the Operating Debtors, the Prepetition Agent and Laureate, as successor in interest to HUD (as assignee of the FHA Mortgagee) (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Intercreditor Agreement")) and (B) junior prepetition liens on FHA Mortgagee's Priority Collateral (as defined in the Intercreditor Agreement).

(iv)    *Validity, Perfection and Priority of Prepetition Liens.* The Debtors (for themselves and their estates) and the Prepetition Agent, for itself and the AR Lenders, acknowledge and agree that: (a) as of the Petition Date, the senior liens granted to the Prepetition Agent on the AR Lender Priority Collateral were (1) valid, binding, enforceable, non-avoidable and properly perfected, and (2) senior in priority over any and all other liens on the AR Lender Priority Collateral, subject only to certain liens otherwise permitted by the Prepetition Credit Documents (to the extent any such permitted liens are valid, properly perfected, non-avoidable and senior in priority to the Prepetition Liens as of the Petition Date, the "Permitted Prior Liens");[2] (b) as of the Petition Date, the junior liens granted to the Prepetition Agent on the FHA Mortgagee's Priority Collateral were (1) valid, binding, enforceable, non-avoidable and properly perfected, and (2) with respect

---

[2] Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to, the Debtors, Laureate, as successor in interest to HUD, the AR Lenders, Edward Don and the Statutory Committee to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such Permitted Prior Liens and/or security interest.

to the priority between the Prepetition Agent and Laureate, as successor in interest to HUD, senior in priority over any and all other liens on the FHA Mortgagee's Priority Collateral, subject only to any liens granted in favor of Laureate, as successor in interest to HUD (to the extent set forth in the Intercreditor Agreement); (c) no offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or AR Lenders' Prepetition Obligations, exist, and no portion of the Prepetition Liens or AR Lenders' Prepetition Obligations is subject to any challenge or defense, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the Debtors and their estates have no claims, objections, challenges, causes of actions, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition Agent, the AR Lenders or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees as such may relate to the validity and extent of the Prepetition Liens; (e) as of the Petition Date, the value of the AR Lenders' Collateral securing the AR Lenders' Prepetition Obligations exceeded the amount of those obligations, and accordingly the AR Lenders' Prepetition Obligations are allowed secured claims within the meaning of §506 of the Bankruptcy Code; and (f) any payments made on account of the AR Lenders' Prepetition Obligations to or for the benefit of the Prepetition Agent or the AR Lenders prior to the Petition Date were on account of amounts in respect of which the Prepetition Agent and the AR Lenders were oversecured, were payments out of the AR Lenders' Collateral, and such payments did not diminish any property otherwise available for distribution to unsecured creditors.

CHICAGO/#3246332.1

(v)    *Cash Collateral.* The Debtors represent that all of the Operating Debtors'

cash, including, without limitation, the cash in their deposit accounts (including, without

limitation, cash transferred from any of their deposit accounts to any deposit account held

by JLM in a representative capacity, or cash representing loan draws or advances under the

Prepetition Credit Documents) wherever located, whether as original collateral or proceeds

of other AR Lenders' Collateral, constitute the Cash Collateral of the Prepetition Agent

and the AR Lenders, with the exception of cash on deposit (as of the Petition Date or

thereafter) in any Lease Payment Account (as that term is defined in the Intercreditor

Agreement), which is solely the cash collateral of Laureate, as successor in interest to

HUD.

(vi)    *Default by the Debtors.* The Debtors acknowledge and stipulate that the

Debtors are in default of their debts and obligations under the Prepetition Credit

Documents.

G.    The Debtors represent that an immediate need exists for them to have access to

Cash Collateral in order to operate their businesses in the ordinary course of business and maintain

their properties in accordance with state and federal law.  In the absence of the use of Cash

Collateral, the ongoing administration of the Debtors' businesses and assets as a going concern

would not be possible, and would cause serious and irreparable harm to the Debtors, their

businesses, and their estates.

H.    Subject to ¶20 below, the Debtors requested that, pursuant to Bankruptcy Code

§ 363(c), the Prepetition Agent, the AR Lenders, Laureate, as successor in interest to HUD and

Edward Don's consent to the Debtors' use of Cash Collateral and the Debtors' use, sale and lease

CHICAGO/#3246332.1

of the other Collateral[3] pursuant to the terms and conditions of this Order (the "Nineteenth Interim Order"). The Debtors acknowledge and agree the Prepetition Agent, the AR Lenders, Laureate, as successor in interest to HUD and Edward Don are entitled to adequate protection pursuant to Bankruptcy Code §§ 361 and 363(e) with respect to Cash Collateral and other Collateral, including, without limitation, to the extent of, and to compensate the AR Lenders for any loss or diminution in the value of Cash Collateral or other Collateral resulting from the Debtors' use of Cash Collateral, the use, sale or lease of other Collateral and the imposition of the automatic stay during the term of this Nineteenth Interim Order.

I.     Laureate, as successor in interest to HUD, asserts that the HUD Loan Documents (as described below) and HUD continues to assert that the HUD Regulatory Agreements (collectively with the HUD Loan Documents, "HUD Documents"), are valid and enforceable against the Debtors, and asserts rights in cash collateral against each Debtor under such documents, including, inter alia:

(i)     security agreements from each Operating Debtor granting security interests in all existing and after acquired property, including, without limitation, cash and deposit accounts;

(ii)     security agreements from JLM granting security interests in existing or hereafter arising accounts, deposit accounts, cash, and other collateral as set forth therein;

(iii)     deposit account instructions and service agreements and deposit account control agreements ("DACAs") from the Operating Debtors, some of which DACAs are also executed by BT Bourbonnais Care, LLC, in its capacity as representative of the Operating Debtors;

---

[3] The terms "Collateral" shall mean the AR Lenders' Collateral and any collateral securing HUD's prepetition obligations.

(iv)     [RESERVED];

(v)     Operating leases executed by Operating Debtors with applicable non-debtor owner of each facility ("Owner" or "Mortgagor"), each subordinated via recorded Subordination Agreements to HUD Regulatory Agreements, mortgages, and HUD Program Requirements (as defined in the HUD Documents);

(vi)     recorded assignments of operating lease rents in each HUD mortgage that secure obligations under the HUD Loan Documents, and recorded assignment of operating lease rents in each HUD Regulatory Agreement with Owners, securing HUD's liability under its endorsement of the applicable mortgage notes; replacement reserve deposits, and obligations thereunder];

(vii)     Intercreditor Agreement with Operating Debtors requiring each Operating Debtor to deposit its monthly operating lease rents into a Lease Payment deposit account of such Operating Debtor, subject to Laureate's first lien DACA.  The Owners and Operating Debtors authorized Laureate, as successor in interest to HUD, to debit out of such account Laureate's debt service, with any excess of the required lease payment over the amount of such debt service to be paid to the applicable Owner.

HUD Documents (i) - (iii) secure Operating Debtors' obligations under their operating leases and their Regulatory Agreements with Laureate, as successor in interest to HUD, as well as the Owners' obligations to Laureate, as successor in interest to HUD under these and other agreements.

J.     Laureate, as successor in interest to HUD, further asserts claims against each Operating Debtor based on the HUD Loan Documents, mortgage insurance contracts, and operating lease rents applicable to each facility, and against JLM, for the aggregate of the

following: The amount of claims, in the aggregate, are no less than (a) $81,834,514 (representing the approximate total outstanding principal amount of the HUD mortgage loans as of the Petition Date), plus interest, protective advances, fees, costs, unpaid deposits to escrows or reserves or other amounts under the HUD loan documents; (b) $82,898,527.52 (representing the approximate aggregate amount paid by HUD under its contracts for mortgage insurance); (c) the amount of rents with respect to each facility, in an approximate amount not less than the amount of debt service on the applicable HUD mortgage loan; and (d) other unpaid amounts, obligations or claims.[4]

K.      Laureate, as successor in interest to HUD, asserts that, as of the Petition Date, the Debtors are in default of their obligations under the HUD Documents and of their obligations to pay operating lease rents.

L.      Laureate, as successor in interest to HUD (with respect to the HUD Loan Documents) and HUD with respect to the HUD Regulatory Agreements, each do not waive or consent to any breach, default, or violation of applicable law or of the HUD Documents, including, but not limited to, those described herein, but reserve all rights, claims, defenses and remedies with respect thereto.

M.      Edward Don asserts that, as of the Petition Date, Terms and Conditions of the extension of credit to each Operating Debtor (as described below) and the Security Documents (collectively, the "Don Documents") are valid and enforceable against the Debtors, and asserts rights in cash collateral and the Collateral against each Operating Debtor under such documents, including, *inter alia*:

---

[4] In the event any of such claims or portions thereof are determined to be post-petition claims, Laureate reserves the right to assert them as post-petition administrative expense claims.

       (i)      security agreements from each Operating Debtor granting security interests in all existing and after acquired property, including, without limitation, cash and all of such Operating Debtor's personal property;

       (ii)     UCC-1 financing statements filed with the Secretary of State of Delaware, securing interests in existing or hereafter arising property, accounts, accounts receivable, cash, and other Collateral as set forth therein.

Edward Don stipulates that its liens and security interests are junior, in all respects, to the liens and security interests held by the Prepetition Agent.

       N.     Subject to the entry, and continued effectiveness, of this Nineteenth Interim Order, the Prepetition Agent, the AR Lenders, Laureate, as successor in interest to HUD and Edward Don, have consented to the Debtors' use of Cash Collateral and use, sale or lease of other Collateral. The foregoing notwithstanding, nothing in this Nineteenth Interim Order shall be construed as limiting or prohibiting the Prepetition Agent, the AR Lenders, Laureate, Edward Don and the Statutory Committee from objecting to any relief sought by the Debtors in these Chapter 11 Cases, including, without limitation, any DIP Financing[5] or any motion for the further use of Cash Collateral, other than the entry of this Nineteenth Interim Order, any other Interim Order entered on the Motion or any Final Order entered on the Motion ("Final Order"), provided any such Interim Order or Final Order is on terms acceptable to the AR Lenders and Laureate.

       O.     Notice of the Preliminary Hearing and the relief requested in the Motion was given to (i) the Office of the United States Trustee; (ii) counsel to the Prepetition Agent, the AR Lenders; (iii) the Illinois Department of Healthcare & Family Services; (iv) HUD and Laureate as its

---

[5] The term "DIP Financing" means any debtor-in-possession financing facility, cash loans or liquidity facility provided to any of the Debtors pursuant to §364 of the Bankruptcy Code secured by liens on and against property of the Debtors' estates.

CHICAGO/#3246332.1

successor in interest, (v) counsel for the Statutory Committee; and (vi) the creditors holding the 20 largest unsecured claims against the Debtors (collectively, the "Notice Parties"). Under the circumstances, such notice of the Preliminary Hearing and the relief requested in the Motion constitutes adequate and sufficient notice under Bankruptcy Code §§ 102(1), 364(c) and 364(d), Bankruptcy Rules 2002 and 4001(c) and the Local Bankruptcy Rules, and no other or further notice need be given.

P.    At the Preliminary Hearing, the Court considered and accepted the offer of proof made by counsel on behalf of the Debtors' representative, Jerry Harris of TM Healthcare Management, LLC ("TM Healthcare"), and other representations made by counsel regarding:

      (i)    the negotiations pertaining to this Nineteenth Interim Order;

      (ii)    the necessity for this Nineteenth Interim Order;

      (iii)    the events leading up to the filing of this Chapter 11 Cases by the Debtors; and

      (iv)    the Debtors need to use Cash Collateral to the extent necessary to avoid immediate and irreparable harm to their estates, pending a final hearing in accordance with Bankruptcy Rule 4001(c).

Q.    Based on the record presented to the Court by the Debtors at the Preliminary Hearing, the Debtors, the Prepetition Agent, the AR Lenders, Laureate and Edward Don and their respective agents, advisors and employees have acted in good faith in negotiating, consenting and agreeing to the Debtors' use of Cash Collateral and use, sale and lease of other Collateral as contemplated and provided by this Nineteenth Interim Order. The negotiation of the terms and provisions of this Nineteenth Interim Order have been conducted at arm's length, that such terms

CHICAGO/#3246332.1

and conditions are fair and reasonable, under the circumstances, and reflect the Debtors' exercise of reasonable business judgment consistent with the Debtors' fiduciary duties.

R.    The Debtors have requested immediate entry of this Nineteenth Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Bankruptcy Rule 4001-2(B). The permission granted herein to use Cash Collateral, on an interim basis and during the term of this Nineteenth Interim Order is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Nineteenth Interim Order is in the best interest of the Debtors' estates and creditors as their implementation will, among other things, provide the Debtors with the necessary funds to conduct the Debtors' businesses as going concerns and maximize the value of the Debtors' assets for the benefit of their creditors and estates.

S.    On January 17, 2019, the Court entered that certain Interim Order (I) Authorizing Debtors to Obtain Secured Post-Petition Financing Pursuant to Section 364 of the Bankruptcy Code and (II) Scheduling a Final Hearing (the "Interim DIP Order") [Dkt. No ___], pursuant to which the Debtors were authorized to obtain DIP Financing from 25 Capital Investment Holdings, LLC, an affiliate of Laureate (the "DIP Lender"). Pursuant to the terms of the DIP Order, the DIP Lender was granted, *inter alia*, (a) liens and security interests junior and subordinate to the liens and security interests of the Prepetition Agent and (b) superpriority claims junior to the Superpriority Claims granted in this Nineteenth Interim Order.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, EFFECTIVE IMMEDIATELY, THAT:

1.    Granting of Motion. The Motion is granted as set forth herein and the continued use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Nineteenth Interim Order.

CHICAGO/#3246332.1

2.     <u>Objections Overruled and/or Withdrawn</u>.   The *Limited Objection* filed by the United Food and Commercial Workers Unions and Employers Midwest Pension Plan [Dkt. No. 62] is overruled.   The *Objection* filed by Edward Don & Company [Dkt. No. 114] is withdrawn. The *Limited Objection* filed by Laureate [Dkt. No. 343] shall be heard on February 7, 2019 at 1:00 p.m.

3.     <u>Authorized Uses of Cash Collateral</u>.   Immediately upon entry of this Nineteenth Interim Order, each of the Debtors are hereby authorized to use Cash Collateral during the term of this Nineteenth Interim Order to pay only the ordinary and reasonable expenses of operating their businesses which are necessary to avoid immediate and irreparable harm, as limited by their respective Budgets as described in ¶7 herein; *provided* the Prepetition Agent, the AR Lenders, Laureate and Edward Don are granted adequate protection for any diminution in the value of the Collateral resulting from (i) the Debtors' use of Cash Collateral pursuant to Bankruptcy Code § 363(c); (ii) the use, sale or lease of the Collateral (other than Cash Collateral) pursuant to Bankruptcy Code § 363(c); and (iii) the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a) as follows:

(1)     the Prepetition Agent, Laureate, as successor in interest to HUD with respect to the Assigned Claims and Edward Don shall be and hereby are granted (effective as of the Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected, replacement security interests in, and liens ("Replacement Liens") on, all of the Debtors' right, title and interest in, to and under the Collateral, subject only to Permitted Prior Liens, to the extent, and in the same priority, as such security interests and liens existed as of the Petition Date.   Other than with respect to proceeds from claims brought under Bankruptcy Code §549, the Replacement Liens shall not extend to any avoidance actions or claims arising under Chapter 5 of the Bankruptcy Code (or any proceeds thereof) in any of the Chapter 11 Cases; and

(2)     if and to the extent the adequate protection of the interests of the Prepetition Agent, Laureate and Edward Don in the Collateral pursuant to this Nineteenth Interim Order proves inadequate, the Prepetition Agent, the AR

17

Lenders, Laureate and Edward Don shall be and hereby are granted an administrative expense claim (the "Superpriority Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, without limitation, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b) and 726, and shall at all times be senior to the rights of the Debtors.  No cost or expense of administration under Bankruptcy Code §§ 105, 364(c)(1), 503(b), 506(c), 507(b) or otherwise, including those resulting from the conversion of any of these Chapter 11 Cases pursuant to Bankruptcy Code § 1112, shall be senior to, or pari passu with, the Superpriority Claims of the Prepetition Agent, the AR Lenders, Laureate and Edward Don.   Other than with respect to claims brought under Bankruptcy Code §549, the Superpriority Claims shall not extend to any avoidance actions or claims arising under Chapter 5 of the Bankruptcy Code (or any proceeds thereof) in any of the Chapter 11 Cases. Unless otherwise agreed to by the Debtors, HUD, Edward Don and the Statutory Committee, any party asserting a Superpriority Claim must obtain an Order of the Bankruptcy Court establishing the amount and validity of such Superpriority Claim and all parties reserve the right to object to same.

4.      Adequate Protection.  Under the circumstances, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Agent, the AR Lenders, Laureate and Edward Don; provided, however, nothing herein contained shall affect or impair the Prepetition Agent's, the AR Lenders', Laureate's and Edward Don's right to seek additional adequate protection of their respective interests or the Debtors' right to oppose such additional adequate protection.

5.      Priorities.  The Replacement Liens shall be prior and senior to all liens and encumbrances (other than Permitted Prior Liens) of all other secured creditors in and to such Collateral granted, or arising, after the Petition Date (including, without limitation, liens and security interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors and the liens of the DIP Lender). The Replacement Liens granted pursuant to this Nineteenth Interim Order shall constitute valid and duly perfected security interests and liens, and the Prepetition Agent, the AR Lenders, Laureate and Edward Don shall not be required to file or serve financing statements, notices of lien or similar

18

instruments in respect thereof which otherwise may be required under federal or state law in any

jurisdiction, or take any action, including taking possession or obtaining control agreements, to

validate and perfect such security interests and liens; and the failure by the Debtors to execute any

documentation relating to the Replacement Liens shall in no way affect the validity, perfection or

priority of such Replacement Liens. If, however, the Prepetition Agent, the AR Lenders, Laureate

or Edward Don, in their sole discretion, determine to file any such financing statements, notices

of lien or similar instruments, or to otherwise confirm perfection of such Replacement Liens, (i) the

Debtors are authorized and directed to cooperate with and assist in such process, as may be

reasonably necessary; (ii) the stay imposed by Bankruptcy Code § 362(a) is hereby lifted to allow

the filing and recording of a certified copy of this Order or any such financing statements, notices

of lien or similar instruments; and (iii) all such documents shall be deemed to have been filed or

recorded at the time of and on the Petition Date, regardless of the actual date of such filing or

recording. Notwithstanding any other provision of this Nineteenth Interim Order, no deficiency in

the perfection, or in the continuation of the perfection, of any prepetition lien shall be cured or

perfected by the entry of this Nineteenth Interim Order.

      6.    <u>Continued Effectiveness of Intercreditor Agreement</u>.  Notwithstanding the rights of

the Debtors, the Statutory Committee and other parties-in-interest (except the AR Lenders and

Prepetition Agent) to contest the validity and priority of Laureate's alleged security interests, as

successor in interest to HUD with respect to the Assigned Claims[6], the provisions of the

Intercreditor Agreement shall (a) remain in full force and effect and shall continue with respect to

the priority of the liens and security interests granted to the Prepetition Agent (on behalf of itself

and the AR Lenders) and Laureate in the Collateral, and (b) be binding on the DIP Lender.

---

[6] On July 23, 2018, the Statutory Committee filed its Adversary Complaint against HUD (Adv. Case. No. 18- 00261).

CHICAGO/#3246332.1

7.    Budget.  Attached hereto as Group Exhibit "A" are individual budgets for each of

the Operating Debtors (collectively, the "Budget") through week ending February 9, 2019, which

has been consented to by the Prepetition Agent, the AR Lenders, Laureate[7] and Edward Don;

*provided, however* that such consent by Laureate above or anywhere else herein does not, and shall

not be deemed to, in any way prejudice, waive or otherwise limit any action, claim or right Laureate

may assert with respect to compelling performance of Debtors' obligations under Section

365(d)(3) of the Bankruptcy Code, including, without limitation, with respect to any request or

demand Laureate may make with respect to the payment of rent or real estate taxes by any of the

Debtors or any party's right to oppose such request or demand.  The Budget reflects, on a line-

item basis, anticipated cash receipts and expenditures on a weekly basis and includes all necessary

and required expenses each Debtor expects to incur during each week of the Budget.  Each Debtor

is authorized to use the Cash Collateral only for payment of such items (and in such amounts) as

are set forth in the Budget.  The Budget may be revised at the end of each week during the term of

this Nineteenth Interim Order, subject to (i) the consent of the Prepetition Agent, the AR Lenders,

the Statutory Committee, Laureate and Edward Don, and (ii) Order of the Court.  Not later than

the fourth (4th) business day of each week, the Debtors shall provide the AR Lenders, Laureate,

Edward Don and the Statutory Committee with a variance report (by Operating Debtor) reflecting,

on a line-item basis, the actual cash disbursements and revenues for the preceding week and the

percentage variance (the "Variance Percent") of such actual disbursements and revenues from

those reflected in the Budget for that period.  Subject to this ¶7 and ¶44 of this Nineteenth Interim

Order, any disbursement by the Debtors other than for budgeted amounts as set forth in the Budget

shall constitute a Default in accordance with the provisions of this Nineteenth Interim Order unless

---

[7] Laureate's consent here is subject to satisfactory resolution of its Limited Objection.

CHICAGO/#3246332.1

the AR Lenders, Laureate and Edward Don consent to those changes in writing or the Court orders otherwise; *provided, however*, (i) the Debtors may make payments in excess of the total budgeted disbursements so long as the Variance Percent for any line item in the Budget shall not exceed ten percent (10.0%) of the budgeted disbursements for that week; and (ii) any amount included in the Budget that is not incurred or paid during a particular week shall be permitted to be carried over into any subsequent week covered by the term of this Nineteenth Interim Order. Notwithstanding any provision in this Nineteenth Interim Order to the contrary, no payment made to any insider of the Debtors, and no payment made by one Debtor by or on behalf of another Debtor, pursuant to this Nineteenth Interim Order shall be deemed to confirm the validity, priority or extent of the claim of any insider or Debtor or insulate that payment from potential challenge, avoidance and recovery.

8.    <u>Cash Management</u>. The Debtors shall continue their prepetition cash management system in accordance with Orders of this Court and pursuant to the existing deposit agreements among the Debtors and its depository banks, subject, in all respects, to any deposit account control agreements and/or deposit account collection agreements). With respect to the foregoing, (i) the termination and fee provisions shall remain in full force and effect (subject to the automatic stay), and (ii) the depository banks are authorized to debit the Debtors' accounts in the ordinary course of business for any postpetition fees, costs and service charges associated with the deposit accounts. The depository banks are authorized to rely on any representations made by the Debtors with respect to whether any check or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of this Court, and such institutions shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

CHICAGO/#3246332.1

9.    <u>Accounting</u>.  As additional adequate protection, the Debtors shall account to the AR Lenders, Laureate and Edward Don for all cash, checks, notes, drafts, instruments, acceptances or other property representing cash or other proceeds of the Collateral in the Debtors' possession, custody or control, by providing the following on a monthly basis (with a copy to the Statutory Committee):  (i) Accounts Receivable Reconciliation and Aging by payor (per the "Point Click Care" payor classifications) and by facility; (ii) daily collections breakdown of all accounts receivable, by facility; (iii) census and summaries by facility; and (iv) correspondence with state and federal regulatory agencies regarding the Debtors' business operations, if any.  Additionally, Debtors shall continue to provide Prepetition Agent with the same access to the Point Click Care system that existed prior to the Petition Date, including cash receipts and posting reports (on a summary basis).  Such access shall continue in place throughout the term of this Nineteenth Interim Order.  For purposes of this ¶9, with the exception of cash on deposit in any Lease Payment Account, all cash, checks, notes, drafts, instruments, acceptances and other property in the nature of items of payment representing proceeds of property and interests in property of the Debtors currently in the possession of the Debtors or in any accounts in financial institutions, including any lock box or depository accounts, shall be deemed proceeds of Collateral unless such proceeds are specifically identified as not being proceeds of Collateral.

10.    <u>Term of Use of Cash Collateral</u>.  The agreement by the Prepetition Agent, the AR Lenders, Laureate and Edward Don to allow the use of Cash Collateral and the Collateral shall continue throughout the term of this Nineteenth Interim Order, unless terminated prior to this date upon the occurrence of the Termination Date or otherwise pursuant to the terms hereof.

11.    <u>Termination Date</u>.  The Debtors' right to use Cash Collateral shall terminate automatically if a Default occurs (the date of any such termination, the "<u>Termination Date</u>"), and

22

the Debtors (a) may not use, sell or lease Cash Collateral; (b) shall segregate and account for any Cash Collateral in its possession, custody or control; and (c) shall hold such Cash Collateral for the exclusive benefit of the AR Lenders, Laureate and Edward Don, subject to further order of the Court; *provided, however,* the obligations and rights of the AR Lenders, Laureate, Edward Don and the Debtors with respect to all transactions which have occurred prior to the Termination Date shall remain unimpaired and unaffected by any such termination and shall survive such termination, including, without limitation, unpaid budgeted expenses incurred prior to the Termination Date (subject to there being Cash Collateral to pay same); *provided further* upon such termination, the AR Lenders, Laureate and Edward Don shall be deemed to have retained all of their rights and remedies, including, without limitation, as provided in the Prepetition Credit Agreements, the HUD Documents, the Don Documents and under the Bankruptcy Code and the Debtors reserve all defenses with respect thereto.

12. <u>Defaults</u>. A default under this Nineteenth Interim Order shall include: (i) the entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case; (ii) the entry of an order appointing a Chapter 11 trustee in any of the Chapter 11 Cases; (iii) the entry of an order granting any other claim superpriority status or a lien equal or superior to the Replacement Liens granted to the Prepetition Agent (other than a Permitted Prior Lien) or equal or superior to the Replacement Liens granted to Laureate, other than a Motion seeking approval of an insurance premium financing program, pursuant to which such financing source seeks liens solely on unearned insurance premiums in connection therewith; (iv) the entry of an order granting any other claim superpriority status or a lien equal or superior to the Replacement Liens granted to Edward Don (other than a Permitted Prior Lien), other than a Motion seeking approval of an insurance premium financing program, pursuant to which such financing

source seeks liens solely on unearned insurance premiums in connection therewith; (v) the entry of an order staying, reversing, vacating or otherwise modifying this Nineteenth Interim Order(except as modified in a final order acceptable to the Prepetition Agent and Laureate, as successor in interest to HUD) without the AR Lenders', Laureate's and Edward Don's prior written consent; (vi) the entry of an order in any of the Chapter 11 Cases appointing an examiner having enlarged powers beyond those set forth under Bankruptcy Code § 1106(a)(3) and (4); (vii) the entry of any order granting any relief from the automatic stay so as to allow a third party to proceed against material assets of any of the Debtors; (viii) the Debtors' failure to have another Interim Order or a Final Order entered on the Motion, in form and substance acceptable to the Prepetition Agent, the AR Lenders, Laureate and Edward Don, on or before February 7, 2019; (ix) the commencement by any of the Debtors of any action adverse to the Prepetition Agent or the AR Lenders inconsistent with the terms and conditions of this Nineteenth Interim Order or the Final Order approving the Motion; (x) any Debtor's failure to comply with the terms and conditions of any Order of this Court, including this Nineteenth Interim Order, (xi) any Debtor's failure to comply with the reporting requirements set forth in the Interim Order; or (xii) the occurrence of a default under the DIP Order (each, a "Default"). The Prepetition Agent, the AR Lenders, the DIP Lender, Laureate and/or Edward Don (as the case may be) shall provide notice of such default ("Default Notice") to counsel for the Debtors, the Statutory Committee and the non-defaulting lenders as soon as practicable after the occurrence of such default, provided, however, the failure to provide the Default Notice shall not affect or impair the exercise of the Prepetition Agent's, the AR Lenders, the DIP Lender's, Laureate's or Edward Don's remedies hereunder. For the avoidance of doubt, the Statutory Committee's pending adversary proceeding against Laureate (Adv. Case No. 18-00261 (Bankr. N.D. Ill.)) or Edward Don (Adv. Case No. 18-0874 (Bankr. N.D.

CHICAGO/#3246332.1

III.)) shall not constitute a Default or otherwise constitute cause to terminate the Debtors' use of Cash Collateral.

13. _Remedies._ Upon the occurrence of a Default, the Prepetition Agent, the AR Lenders and/or Laureate and/or Edward Don may (a) enjoin and prohibit the Debtors from using Cash Collateral and/or other Collateral without further modification of the automatic stay pursuant to Bankruptcy Code § 362 which is hereby deemed modified and vacated to the extent necessary to permit such action, and (b) seek entry of an Order modifying the automatic stay pursuant to Bankruptcy Code § 362(a), to permit the Prepetition Agent, the AR Lenders, HUD or Edward Don (as the case may be) to exercise any other rights and remedies under the Prepetition Credit Documents, the HUD Documents, the Don Documents and this Nineteenth Interim Order. Upon any Debtor's receipt of a Default Notice, it shall immediately cease making any disbursements except those already accrued in accordance with the Budget, subject to further order of the Court after notice and a hearing.

14. _Payments._ On or before the fourth business day of each week during the term of this Nineteenth Interim Order, the Debtors shall make the adequate protection payments to the AR Lenders as provided for in this Nineteenth Interim Order; which amounts shall be applied against the AR Lenders' Prepetition Obligations in accordance with the terms of the Prepetition Credit Documents; _provided, however_, if it is subsequently determined the AR Lenders are not entitled to the payment of interest, fees or costs, such amounts will be applied to the outstanding principal balance of the AR Lenders' Prepetition Obligations; _provided, further, however_, no amounts shall be paid to the AR Lenders' attorneys and consultants prior to allowance of their respective fees and costs in accordance with ¶18 hereof. In the event Debtors do not have sufficient Cash Collateral to make such weekly payments, it shall not be considered a Default hereunder provided

CHICAGO/#3246332.1

the Debtors can establish "cause" to (i) MidCap, or (ii) this Court (upon Motion and after notice and a hearing). Assuming the Debtors' collections during the term of this Nineteenth Interim Order are consistent with their May - June 2018 collections, the Debtors, Laureate, the Statutory Committee and the AR Lenders shall continue to negotiate in good faith respecting further provisional payments to the AR Lenders.

15.    Financial Reports. In addition to the reporting requirements set forth in ¶¶7 and 9 above, the Debtors are hereby required to deliver to the AR Lenders, Laureate and Edward Don, such other financial and other information concerning the business and affairs of the Debtors as the AR Lenders and/or Laureate and/or Edward Don shall reasonably request from time to time, including, without limitation, weekly borrowing base certificates on each Wednesday (for the immediately preceding week). The Debtors shall cooperate with and permit the AR Lenders, Laureate and Edward Don to audit the Collateral at any reasonable times requested by the AR Lenders, Laureate and/or Edward Don. The Debtors shall further provide the AR Lenders, Laureate and Edward Don with detailed information as to the extent and composition of the Collateral and any collections thereon. Any information provided to the AR Lenders by the Debtors pursuant to this Nineteenth Interim Order shall be contemporaneously shared with the Statutory Committee and Laureate; provided, however, no provision in this Nineteenth Interim Order shall be deemed to provide the Statutory Committee or Laureate or Edward Don with access to the Point Click Care system.

16.    No Control. By taking any actions pursuant to this Nineteenth Interim Order, the Prepetition Agent, the AR Lenders, Laureate and Edward Don shall not: (a) be deemed to be in control of the operations or sale of the Debtors; or (b) be deemed to be acting as a "responsible person" or "owner or operator" with respect to the operation, management or sale of the Debtors.

CHICAGO/#3246332.1

17.     <u>Survival</u>.  The provisions of this Nineteenth Interim Order and any actions taken pursuant hereto shall survive entry of any order, including without limitation (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a Chapter 7 case; or (c) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Order as well as the Superpriority Claims and Replacement Liens granted pursuant to this Order and the Prepetition Credit Documents shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims and Replacement Liens shall maintain their priority as provided by this Order until all AR Lenders' Prepetition Obligations, all amounts due Laureate, as successor in interest to HUD, all amounts due Edward Don and any other amounts due AR Lenders, Laureate and Edward Don are indefeasibly paid in full and discharged.

18.     <u>AR Lenders' Attorneys and Consultants</u>.  The AR Lenders may, in their sole discretion, retain attorneys and consultants to review business and legal matters pertaining to the business and property of the Debtors and to seek, by filing a Motion with the Court, recovery of reasonable amounts paid to such attorneys and consultants from the Debtors upon reasonable notice to the Notice Parties.  Each of the Debtors are authorized and directed to permit the consultants of the AR Lenders to examine the respective corporate, financial and operating records, inspect the assets, properties, operations and affairs of the Debtors, visit any or all of the offices of the Debtors to discuss such matters with its officers, independent auditors, accountants or consultants (and the Debtors hereby authorize such independent auditors, accountants and consultant to discuss such matters with the AR Lenders' consultants), and the Debtors will cooperate with the AR Lenders' consultants in all reasonable respects.

19.     <u>Recoupment</u>.  This Nineteenth Interim Order does not affect or impair the United States' Medicare recoupment rights, claims and/or defenses, including jurisdictional requirements

CHICAGO/#3246332.1

and defenses arising under the Medicare Act. Further, nothing in this Nineteenth Interim Order

affects the Centers for Medicare & Medicaid Service' ("CMS") authority to (i) review and approve

or deny Debtors' Medicare claims in the ordinary course, or (ii) determine overpayments for

prepetition and postpetition claims in the ordinary course, subject, in each case, to the Debtors'

rights and defenses concerning the same. Further, nothing in this Nineteenth Interim Order shall

affect or impair the set-off or recoupment rights, claims and/or defenses of the United States of

America and all its federal agencies (collectively, the "Federal Agencies"). Finally, nothing in the

Nineteenth Interim Order shall affect or impair the rights of the Debtors, the Statutory Committee

or any other party-in-interest (other than the AR Lenders), to oppose, object or defend against such

recoupment and other rights, claims and/or defenses of the United States,  HUD, CMS or any of

the Federal Agencies.

20.    _Debtors' Stipulations_.  Except as modified in this ¶20, the Debtors' Stipulations as

to the AR Lenders and the Prepetition Agent shall be binding upon all parties-in-interest, including

without limitation, the Debtors, Laureate, the DIP Lender and the Statutory Committee and shall

be deemed to be binding on all parties-in-interest for all purposes in these Chapter 11 Cases and

any subsequent Chapter 7 cases.  Other than with respect to the Unencumbered Assets (defined

below), the Prepetition Agent's liens on the AR Lenders' Collateral shall be deemed legal, valid,

binding, properly perfected, not subject to defense, counterclaim, offset of any kind, subordination

and otherwise unavoidable, and the AR Lenders, the AR Lenders' Prepetition Obligations and the

Prepetition Agent's liens on the AR Lenders' Collateral shall not be subject to any other or further

challenge by any party-in-interest seeking to exercise the rights of the Debtors' estates, including

without, limitation, any successor thereto.  Notwithstanding anything to the contrary contained

herein or in any other Interim Order, the Prepetition Agent does not have valid perfected liens over

CHICAGO/#3246332.1

any of (x) the Debtors' Commercial Tort Claims as that term is defined in section 102(13) of Article 9 of the Uniform Commercial Code, (y) the Debtors' Fixtures as that term is defined in section 102(41) of Article 9 of the Uniform Commercial Code, or (z) the Debtors' vehicles, including, but not limited to, that certain 2013 Ford F150 owned by WCT Care, LLC (collectively, the "Unencumbered Assets").

21.    DIP Order. Notwithstanding anything to the contrary contained in the DIP Order, the Debtors shall contemporaneously provide the Prepetition Agent and the Statutory Committee with copies of all documents any of them are required to provide the DIP Lender pursuant to the Interim DIP Order.

22.    Nineteenth Interim Order Binding. The provisions of this Nineteenth Interim Order shall be binding upon and inure to the benefit of the Prepetition Agent, the AR Lenders, Laureate, Edward Don and their successors and assigns, and the Debtors, and their successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 Cases as a legal representative of the Debtors or their estates.

23.    Marshaling. During the term of this Nineteenth Interim Order, the Prepetition Agent, the AR Lenders, Laureate and Edward Don shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any Collateral.

24.    **[RESERVED]**

25.    Further Assurances. The Debtors are authorized to perform all acts, and execute and comply with the terms of such other documents, instruments and agreements in addition to the Prepetition Credit Documents, as the Prepetition Agent or the AR Lenders may reasonably require, or which otherwise may be deemed reasonably necessary by the Prepetition Agent or the AR Lenders to effectuate the terms and conditions of this Nineteenth Interim Order and the Prepetition

Credit Documents, provided any such acts are not inconsistent with the terms of the Intercreditor Agreement or this Nineteenth Interim Order.

26.    _Insurance; Maintenance of Property_.  Until the payment in full, in cash, of all amounts due the AR Lenders and Laureate, the Debtors shall maintain (i) insurance on the Collateral and the facilities to cover their assets from fire, theft and other damage, and (ii) professional liability insurance, all in compliance with, and to the extent required by, HUD Program Obligations.  The Debtors shall also maintain the Collateral and their businesses in good repair.

27.    _Collateral Rights_.  Until all of the AR Lenders' Prepetition Obligations have been indefeasibly paid and satisfied in full in immediately available funds and without further order of the Bankruptcy Court, in the event any party who holds a lien or security interest in any of the Collateral that is junior and/or subordinate to the liens and claims of the Prepetition Agent in such Collateral receives or is paid proceeds of the Collateral prior to the indefeasible payment and satisfaction in full of all AR Lenders' Prepetition Obligations (other than, for the avoidance of doubt, any proceeds received or paid pursuant to any Budget), such junior or subordinate lienholder shall be deemed to have received, and shall hold such Collateral proceeds in trust for the Prepetition Agent and the AR Lenders and shall immediately turnover to the Prepetition Agent such proceeds for application to the AR Lenders' Prepetition Obligations absent the entry of a final and non-appealable Order of the Court, entered after notice and opportunity for a hearing, at which the Court determines the value of the AR Lender Priority Collateral exceeds the amounts owed to the AR Lenders; _provided, however_, nothing herein shall be deemed to adversely impact or otherwise alter the rights of the DIP Lender as to any senior liens it may have on property of the Debtors' estates that is not "Shared Collateral" (as that term is defined in the Interim DIP Order).

CHICAGO/#3246332.1

28.    <u>Sales of Collateral</u>.  Absent Court approval, the Debtors shall not sell, transfer, lease, encumber, settle by compromise or otherwise dispose of any portion of the Collateral outside the ordinary course of business.

29.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Nineteenth Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

30.    <u>Aged Accounts Receivable</u>.  Without limiting in any way the reporting obligations of the Debtors set forth elsewhere in this Nineteenth Interim Order, the Debtors shall notify Prepetition Agent, Laureate, Edward Don and the Statutory Committee in writing promptly (but in any event within five (5) Business Days) upon (i) receipt of any voucher respecting accounts receivable aged more than two hundred ten (210) days, which notification shall contain the amount of such payment(s), the Operating Debtor and facility that performed such services, the dates of service to which such payment relates, the name(s) of the account debtor(s) making such payment and the name of the payee; and (ii) notification from any entity (including any managed care organization) regarding the amount and timing of any payments of accounts receivable aged more than two hundred ten (210) days.

31.    <u>Section 552(b)</u>.  During the terms of this Nineteenth Interim Order, the Prepetition Agent, the AR Lenders, Laureate and Edward Don shall be entitled to all of the rights and benefits of §552(b) of the Bankruptcy Code, and the "<u>equities of the case</u>" exception under §552(b) of the Bankruptcy Code shall not apply with respect to proceeds, product, offspring or profits of any of the Collateral.

32.    <u>Joint and Several Liability</u>.  Nothing in this Nineteenth Interim Order shall be construed to (i) constitute a substantive consolidation of any of the Debtors' estates, it being

CHICAGO/#3246332.1

understood, however, the Debtors shall be jointly and severally liable for their obligations under this Nineteenth Interim Order, (ii) modify or amend any of the Debtor's obligations under the Prepetition Credit Documents or the HUD Loan Documents or the Don Documents.

33.   Rights Preserved.  Other than as expressly set forth herein, any other rights, claims or privileges (whether legal, equitable or otherwise) of the Prepetition Agent, the AR Lenders, HUD, Edward Don, the Statutory Committee and/or the Debtors are preserved.

34.   No Waiver by Failure to Seek Relief.  The failure of the Prepetition Agent, the AR Lenders, Laureate or Edward Don to seek relief or otherwise exercise their respective rights and remedies under this Nineteenth Interim Order, the Prepetition Credit Documents, the HUD Documents, the Don Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

35.   Binding Effect of Nineteenth Interim Order.  Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Nineteenth Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition Agent, the AR Lenders, Laureate, as successor in interest to HUD with respect to the Assigned Claims, Edward Don, all other creditors of any of the Debtors, the Statutory Committee and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases.

36.   Final Hearing.  The Final Hearing will be held before the Court on February 7, 2019 at 1:00 p.m. (CST).  Any objections to entry of the Final Order shall be in writing and filed with the Clerk of this Court by no later than January 30, 2019 at 5:00 p.m., prevailing Central Standard Time (the "Objection Deadline"), with a copy of any such objection served so that it is actually received by counsel of record for the Prepetition Agent and the AR Lenders on or before the

CHICAGO/#3246332.1

Objection Deadline and otherwise timely served on all other parties entitled to notice in these

Chapter 11 Cases in accordance with the applicable Bankruptcy Rules and Local Rules. Each of

the Debtors, Laureate, the DIP Lenders, the Prepetition Agent, the AR Lenders and the Statutory

Committee agree to continue to use their best efforts to respond to any discovery requests on an

expedited basis prior to the commencement of the Final Hearing.

37.    _Nineteenth Interim Order Controls_.  In the event of any inconsistency between the

terms and conditions of the Interim Order and this Nineteenth Interim Order, the provisions of this

Nineteenth Interim Order shall govern and control.

38.    _Effect of this Nineteenth Interim Order_.  This Nineteenth Interim Order shall

constitute findings of fact and conclusions of law pursuant to Bankruptcy Rules 7052 and 9014(c)

and shall take effect and be enforceable _nunc pro tunc_ to the Petition Date immediately upon

execution hereof.

39.    _No Waiver_.  Nothing in Nineteenth Interim Order shall impair, restrict, waive,

impede or otherwise limit the rights of the Debtors, AR Lenders, the Prepetition Agent, the United

States of America, the Federal Agencies (including, without limitation, HUD), Laureate Edward

Don, the Statutory Committee or any other creditor or party-in-interest to timely dispute, contest,

or object to any of the findings, facts or Debtors' Stipulations contained herein, including but not

limited to the existence, enforceability or priority of the Prepetition Agent's (for its benefit and the

benefit of the AR Lenders), Laureate's security interest, as successor in interest to HUD with

respect to the Assigned Claims, in any of the Cash Collateral, Edward Don's security interest in

any of the Cash Collateral or other Collateral, or other Collateral, except as such rights have been

expressly waived by the Debtors pursuant to this Order or as may otherwise be prohibited by the

Intercreditor Agreement. For the avoidance of doubt, nothing contained in this Nineteenth Interim

Order shall prejudice, impair or otherwise affect (i) the claims asserted in the Statutory

Committee's pending adversary proceeding against Laureate (Adv. Case No. 18-00261 (Bankr.

N.D. Ill.)) or Edward Don (Adv. Case No. 18-0874 (Bankr. N.D. Ill.)) or (ii) the rights of any

party-in-interest to object to the Retained Regulatory Claims.

    40.   <u>SH Care, LLC</u>.  Notwithstanding anything to the contrary contained in any Orders

of this Court governing cash management, the Debtors are authorized and directed to take any

actions reasonably necessary to prevent funds payable to its non-Debtor affiliate, SH Care, LLC,

from being transferred to any account owned by any of the Debtors.  Notwithstanding the

foregoing, in the event any Debtor receives payment(s) on account of services previously rendered

by SH Care, LLC, it shall immediately remit such payment(s) to the Prepetition Agent and such

proceeds shall not be considered property of the Debtors' estates.  Contemporaneous with making

such payment, the Debtors will immediately provide (or cause SH Care, LLC to provide) all

documentation in their respective possession reasonably relating to such services (e.g., warrants,

vouchers, checks or remittance advices from the account payor, documentation as to the services

giving rise to the account, etc.) to counsel for HUD, the Statutory Committee, Edward Don and

the Prepetition Agent.  If no objection to such payment is received by the Debtors and the

Prepetition Agent within five business days of the Debtors (or SH Care, LLC) providing such

documentation, such payment shall be deemed to be final and not otherwise subject to

disgorgement or attack.  To the extent an objection is timely asserted in which a party alleges that

such payment was property of the Debtors' estates, this Court shall retain jurisdiction over this

matter in the event the parties are unable to reach resolution.

CHICAGO/#3246332.1

41.   Development Specialists, Inc.

(a)   In furtherance of that certain *Order Granting Motion for Employment of Developmental Specialists, Inc. as Financial Advisors to the Debtors* [Dkt. No. 124] and the Engagement Letter attached to the *Debtors' Motion for Employment of Developmental Specialists, Inc. as Financial Advisors to the Debtors* [Dkt. No. 118], Development Specialists Inc. ("DSI") shall, to the extent not already completed, complete the following tasks on behalf of the Operating Debtors: (i) update weekly budget to actual, and provide same to the AR Lenders, HUD, Edward Don and the Statutory Committee; (ii) complete Monthly Operating Reports for each of the Debtors and timely file Monthly Operating Reports thereafter; (iii) work with TM Healthcare to ensure all accounts payable are entered, and correctly separated into pre- and post-petition payables; (iv) provide an aging of the pre- and post-petition accounts payable as of December 31, 2017, January 31, 2018 and weekly thereafter to the AR Lenders, Laureate, Edward Don and the Statutory Committee; (v) work with TM Healthcare to ensure all accounts receivable are posted within 48 hours of receipt of remittance advices; (vi) provide an aging of accounts receivable as of December 31, 2017, January 31, 2018, and weekly thereafter to the AR Lenders, Laureate, Edward Don and the Statutory Committee; (vii) provide a complete listing of all bank accounts, including those holding patient trust monies, to the AR Lenders, Laureate, Edward Don and the Statutory Committee; (viii) provide copies of all bank statements with the Monthly Operating Reports, or separately (to the AR Lenders, Laureate, Edward Don and the Statutory Committee), for all bank accounts; and (ix) work with TM Healthcare to sync budget line items to reporting line items.

(b)     This Court shall subsequently rule (upon application and after notice and a hearing) whether the cost of DSI's services will be a dollar-for-dollar deduct from amounts otherwise payable to TM Healthcare.

(c)     DSI shall use its reasonable efforts to work with the financial consultants retained by the AR Lenders, Laureate, Edward Don and the Statutory Committee to allow each party access to the information required to be provided for herein.  Without limiting the generality of the foregoing, at a minimum, DSI also shall provide copies of such deliverables to Laureate.

42.     Professional Fees.  Notwithstanding any provision in this Nineteenth Interim Order or the Budget to the contrary, fees and expenses allowed or paid during the term of this Nineteenth Interim Order for professionals retained by the Debtors and the Statutory Committee, shall not exceed $130,000.  For the avoidance of doubt, any carve-outs described in any of the prior Interim Orders have been fully funded prior to the term of this Nineteenth Interim Order.  Payments to be made pursuant to this paragraph may only be made after the then due weekly adequate protection payments are made to the AR Lenders as described in the Budget.

43.     **[RESERVED]**

44.     Payments for Goods and Services Received Prior to March 15, 2018.  Prior to making any disbursements during the term of this Nineteenth Interim Order for goods received or services rendered prior to March 15, 2018, the Debtors shall provide the Prepetition Agent with a report indicating the amount of such disbursement(s) and the date of the underlying invoice(s) for such goods or services.  The Prepetition Agent shall, only with respect to good received or services rendered prior to March 15, 2018, have two business days to review such information; if the Prepetition Agent fails to object to such payment(s) within such 2 business day period, the Debtors shall be authorized to make such payment(s).  If an objection is timely asserted (via written

CHICAGO/#3246332.1

communication to counsel for the Debtors and the Statutory Committee), the Debtors shall (i)

promptly respond to any inquiry from the Prepetition Agent regarding such proposed payment(s),

including, without limitation, by providing copies of the invoice(s) to be paid, and (ii) not make

any payment(s) subject to any timely asserted objection without agreement of the Prepetition

Agent or subsequent Order of this Court.

CHICAGO/#3246332.1

45.   _Retention of Jurisdiction_. The Court has and will retain jurisdiction to enforce this Nineteenth Interim Order according to its terms.

DATE: January 17, 2019

ENTER:

_Janet S. Baer_

Honorable Janet S. Baer
United States Bankruptcy Judge

STIPULATED AND AGREED:

By:   _/s/ David K. Welch_
      Burke Warren, MacKay & Seritella, P.C.
      330 N. Wabash, Suite 2100
      Chicago, IL 60611-3607

      **Counsel for the Debtors**

STIPULATED AND AGREED:

By:   _/s/ Shelly A. DeRousse_
      Freeborn & Peters
      311 South Wacker Drive
      Suite 3000
      Chicago, IL 60606

      **Counsel for the Statutory Committee**

STIPULATED AND AGREED:

By:   _/s/ Lauren Newman_
      Thompson Coburn LLP
      55 E. Monroe Street, 37th Floor
      Chicago, IL 60603

      **Counsel for Edward Don**

STIPULATED AND AGREED:

By:   _/s/ Michael M. Eidelman_
      Vedder Price P.C.
      222 N. LaSalle St., Suite 2600
      Chicago, IL 60601

      **Counsel for the Prepetition Agent and the AR Lenders**

STIPULATED AND AGREED:

By:   _/s/Craig E. Reimer_
      Mayer Brown LLP
      71 South Wacker Drive
      Suite 3000
      Chicago, IL 60606

      **Counsel for Laureate and the DIP Lender**

38

CHICAGO/#3246332.1

# Group Exhibit A

**JLM Financial Healthcare**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week |
| --- | --- | --- | --- | --- |
| | 1 | 2 | 3 | Total |
| **CASH RECEIPTS** | | | | |
| Collections | 1,300,000 | 1,300,000 | 1,300,000 | 3,900,000 |
| **Total Estimated Cash Receipts** | **1,300,000** | **1,300,000** | **1,300,000** | **3,900,000** |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 330,000 | 1,275,000 | - | 1,605,000 |
| Supplies | 120,000 | 120,000 | 120,000 | 360,000 |
| Insurance - Medical and Dental | 140,000 | 25,000 | 25,000 | 190,000 |
| Insurance - Liability | - | 300,000 | | 300,000 |
| Union Dues/Healthcare/Pension | 70,000 | - | | 70,000 |
| TM Management Fee | 105,000 | - | 105,000 | 210,000 |
| Health and Family Services-Bed Tax | - | - | 150,000 | 150,000 |
| Rent | - | - | - | |
| Utilities | 100,000 | 32,500 | 32,500 | 165,000 |
| Leases | 5,350 | | 5,350 | 10,699 |
| Facility compliance | 15,000 | 15,000 | 15,000 | 45,000 |
| Data processing | 30,000 | - | - | 30,000 |
| Maintenance | 10,000 | 10,000 | 10,000 | 30,000 |
| Transactional Fees | - | 20,000 | - | 20,000 |
| Miscellaneous Expense | 7,500 | 7,500 | 7,500 | 22,500 |
| **Total Operating Disbursements** | **932,850** | **1,805,000** | **470,350** | **3,208,199** |
| **Other Disbursements** | | | | |
| MidCap | 10,000 | 10,000 | 10,000 | 30,000 |
| DIP costs and fees | | | | |
| Professional fees | 30,000 | 50,000 | - | 80,000 |
| Trustee Fees | - | 150,000 | - | 150,000 |
| **Total Other Disbursements** | **40,000** | **210,000** | **10,000** | **260,000** |
| **Total Disbursements** | **972,850** | **2,015,000** | **480,350** | **3,468,199** |
| | | | | |
| **Change for the Period** | **327,150** | **(715,000)** | **819,650** | **431,801** |
| Beginning Cash | 172,356 | 499,506 | 25,000 | 172,356 |
| Liquidity before DIP financing | 499,506 | (215,494) | 844,650 | 604,156 |
| DIP Financing - Borrowing | - | 240,494 | - | 240,494 |
| **Ending Cash** | **499,506** | **25,000** | **844,650** | **844,650** |

**Notes:**
1) This financial analysis is to be used for planning purposes only.  These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy.  These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates .  True results may differ materially from planned with respect to census and PPD cost.

**BT Bourbonnais Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week Total |
|---|---|---|---|---|
| | 1 | 2 | 3 | |
| **CASH RECEIPTS** | | | | |
| Collections | 150,000 | 150,000 | 150,000 | 450,000 |
| **Total Estimated Cash Receipts** | 150,000 | 150,000 | 150,000 | 450,000 |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 35,000 | 135,000 | | 170,000 |
| Supplies | 13,750 | 13,750 | 13,750 | 41,250 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 25,000 | | 25,000 |
| Union Dues/Healthcare/Pension | 8,000 | | | 8,000 |
| TM Management Fee | 12,115 | | 12,115 | 24,231 |
| Health and Family Services-Bed Tax | | | | |
| Rent | | | | |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 1,500 | 1,500 | 1,500 | 4,500 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,000 | 1,000 | 1,000 | 3,000 |
| Transactional Fees | | 2,000 | | 2,000 |
| Miscellaneous Expense | 750 | 750 | 750 | 2,250 |
| **Total Operating Disbursements** | 102,710 | 185,389 | 36,099 | 324,197 |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 13,000 | | 13,000 |
| **Total Other Disbursements** | 4,444 | 19,667 | 1,111 | 25,222 |
| **Total Disbursements** | 107,154 | 205,056 | 37,210 | 349,420 |
| | | | | |
| **Change for the Period** | 42,846 | (55,056) | 112,790 | 100,580 |
| Beginning Cash | 19,151 | 61,996 | 6,941 | 19,151 |
| | | | | |
| Liquidity before DIP financing | 61,996 | 6,941 | 119,731 | 119,731 |
| | | | | |
| DIP Financing - Borrowing | - | - | - | |
| | | | | |
| **Ending Cash** | 61,996 | 6,941 | 119,731 | 119,731 |

**Notes:**
1) This financial analysis is to be used for planning purposes only. These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy. These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates . True results may differ materially from planned with respect to census and PPD cost.

**CC Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week |
| --- | --- | --- | --- | --- |
| | 1 | 2 | 3 | Total |
| **CASH RECEIPTS** | | | | |
| Collections | 220,000 | 220,000 | 220,000 | 660,000 |
| **Total Estimated Cash Receipts** | **220,000** | **220,000** | **220,000** | **660,000** |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 55,000 | 225,000 | | 280,000 |
| Supplies | 24,200 | 24,200 | 24,200 | 72,600 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 56,000 | | 56,000 |
| Union Dues/Healthcare/Pension | 10,000 | | | 10,000 |
| TM Management Fee | 17,769 | | 17,769 | 35,538 |
| Health and Family Services-Bed Tax | | | 28,000 | 28,000 |
| Rent | | | | - |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 2,500 | 2,500 | 2,500 | 7,500 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,500 | 1,500 | 1,500 | 4,500 |
| Transactional Fees | | 3,000 | | 3,000 |
| Miscellaneous Expense | 1,000 | 1,000 | 1,000 | 3,000 |
| **Total Operating Disbursements** | **142,564** | **319,589** | **81,953** | **544,105** |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 25,500 | | 25,500 |
| **Total Other Disbursements** | **4,444** | **32,167** | **1,111** | **37,722** |
| **Total Disbursements** | **147,008** | **351,756** | **83,064** | **581,827** |
| | | | | |
| **Change for the Period** | **72,992** | **(131,756)** | **136,936** | **78,173** |
| Beginning Cash | 19,151 | 92,143 | 1,000 | 19,151 |
| Liquidity before DIP financing | 92,143 | (39,613) | 137,936 | 97,323 |
| DIP Financing - Borrowing | - | 40,613 | - | 40,613 |
| **Ending Cash** | **92,143** | **1,000** | **137,936** | **137,936** |

**Notes:**
1) This financial analysis is to be used for planning purposes only.  These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy.  These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates .  True results may differ materially from planned with respect to census and PPD cost.

**CT Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week Total |
|---|---|---|---|---|
| | 1 | 2 | 3 | |
| **CASH RECEIPTS** | | | | |
| Collections | 110,000 | 110,000 | 110,000 | 330,000 |
| **Total Estimated Cash Receipts** | 110,000 | 110,000 | 110,000 | 330,000 |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 30,000 | 100,000 | | 130,000 |
| Supplies | 8,000 | 8,000 | 8,000 | 24,000 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 26,000 | | 26,000 |
| Union Dues/Healthcare/Pension | 6,000 | | | 6,000 |
| TM Management Fee | 8,885 | | 8,885 | 17,769 |
| Health and Family Services-Bed Tax | | | 21,000 | 21,000 |
| Rent | | | | |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 1,500 | 1,500 | 1,500 | 4,500 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,000 | 1,000 | 1,000 | 3,000 |
| Transactional Fees | | 2,000 | | 2,000 |
| Miscellaneous Expense | 750 | 750 | 750 | 2,250 |
| **Total Operating Disbursements** | 86,729 | 145,639 | 48,118 | 280,486 |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 17,000 | | 17,000 |
| **Total Other Disbursements** | 4,444 | 23,667 | 1,111 | 29,222 |
| **Total Disbursements** | 91,173 | 169,306 | 49,229 | 309,708 |
| | | | | |
| **Change for the Period** | 18,827 | (59,306) | 60,771 | 20,292 |
| Beginning Cash | 19,151 | 37,977 | 1,000 | 19,151 |
| Liquidity before DIP financing | 37,977 | (21,328) | 61,771 | 39,443 |
| DIP Financing - Borrowing | - | 22,328 | - | 22,328 |
| **Ending Cash** | 37,977 | 1,000 | 61,771 | 61,771 |

Notes:
1) This financial analysis is to be used for planning purposes only. These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy. These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates . True results may differ materially from planned with respect to census and PPD cost.

**FT Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week |
|---|---|---|---|---|
|  | 1 | 2 | 3 | Total |
| **CASH RECEIPTS** |  |  |  |  |
| Collections | 110,000 | 110,000 | 110,000 | 330,000 |
| **Total Estimated Cash Receipts** | 110,000 | 110,000 | 110,000 | 330,000 |
|  |  |  |  |  |
| **CASH DISBURSEMENTS** |  |  |  |  |
| **Operating Disbursements** |  |  |  |  |
| Payroll | 30,000 | 100,000 |  | 130,000 |
| Supplies | 7,100 | 7,100 | 7,100 | 21,300 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability |  | 21,000 |  | 21,000 |
| Union Dues/Healthcare/Pension | 8,000 |  |  | 8,000 |
| TM Management Fee | 8,885 |  | 8,885 | 17,769 |
| Health and Family Services-Bed Tax |  |  | 18,000 | 18,000 |
| Rent |  |  |  |  |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 |  | 594 | 1,189 |
| Facility compliance | 1,500 | 1,500 | 1,500 | 4,500 |
| Data processing | 3,333 |  |  | 3,333 |
| Maintenance | 1,000 | 1,000 | 1,000 | 3,000 |
| Transactional Fees |  | 2,000 |  | 2,000 |
| Miscellaneous Expense | 750 | 750 | 750 | 2,250 |
| **Total Operating Disbursements** | 87,829 | 139,739 | 44,218 | 271,786 |
| **Other Disbursements** |  |  |  |  |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees |  |  |  |  |
| Professional fees | 3,333 | 5,556 |  | 8,889 |
| Trustee Fees |  | 12,000 |  | 12,000 |
| **Total Other Disbursements** | 4,444 | 18,667 | 1,111 | 24,222 |
| **Total Disbursements** | 92,273 | 158,406 | 45,329 | 296,008 |
|  |  |  |  |  |
| **Change for the Period** | 17,727 | (48,406) | 64,671 | 33,992 |
| Beginning Cash | 19,151 | 36,877 | 1,000 | 19,151 |
| Liquidity before DIP financing | 36,877 | (11,528) | 65,671 | 53,143 |
| DIP Financing - Borrowing | - | 12,528 | - | 12,528 |
| **Ending Cash** | 36,877 | 1,000 | 65,671 | 65,671 |

**Notes:**
1) This financial analysis is to be used for planning purposes only.  These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy.  These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates .  True results may differ materially from planned with respect to census and PPD cost.

**JT Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 1 | 2/2/2019 2 | 2/9/2019 3 | 3 Week Total |
|---|---|---|---|---|
| **CASH RECEIPTS** | | | | |
| Collections | 110,000 | 110,000 | 110,000 | 330,000 |
| **Total Estimated Cash Receipts** | **110,000** | **110,000** | **110,000** | **330,000** |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 30,000 | 110,000 | | 140,000 |
| Supplies | 9,400 | 9,400 | 9,400 | 28,200 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 21,000 | | 21,000 |
| Union Dues/Healthcare/Pension | 8,000 | | | 8,000 |
| TM Management Fee | 8,885 | | 8,885 | 17,769 |
| Health and Family Services-Bed Tax | | | 20,000 | 20,000 |
| Rent | | | | |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 1,500 | 1,500 | 1,500 | 4,500 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,000 | 1,000 | 1,000 | 3,000 |
| Transactional Fees | | 2,000 | | 2,000 |
| Miscellaneous Expense | 750 | 750 | 750 | 2,250 |
| **Total Operating Disbursements** | **90,129** | **152,039** | **48,518** | **290,686** |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | - |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 12,000 | | 12,000 |
| **Total Other Disbursements** | **4,444** | **18,667** | **1,111** | **24,222** |
| **Total Disbursements** | **94,573** | **170,706** | **49,629** | **314,908** |
| | | | | |
| **Change for the Period** | **15,427** | **(60,706)** | **60,371** | **15,092** |
| Beginning Cash | 19,151 | 34,577 | 1,000 | 19,151 |
| Liquidity before DIP financing | 34,577 | (26,128) | 61,371 | 34,243 |
| DIP Financing - Borrowing | - | 27,128 | - | 27,128 |
| **Ending Cash** | **34,577** | **1,000** | **61,371** | **61,371** |

**Notes:**
1) This financial analysis is to be used for planning purposes only.  These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy.  These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates .  True results may differ materially from planned with respect to census and PPD cost.

**KT Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week Total |
|---|---|---|---|---|
| | 1 | 2 | 3 | |
| **CASH RECEIPTS** | | | | |
| Collections | 140,000 | 140,000 | 140,000 | 420,000 |
| **Total Estimated Cash Receipts** | 140,000 | 140,000 | 140,000 | 420,000 |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 30,000 | 115,000 | | 145,000 |
| Supplies | 9,050 | 9,050 | 9,050 | 27,150 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 22,000 | | 22,000 |
| Union Dues/Healthcare/Pension | 7,000 | | | 7,000 |
| TM Management Fee | 11,308 | | 11,308 | 22,615 |
| Health and Family Services-Bed Tax | | | | |
| Rent | | | | |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 1,500 | 1,500 | 1,500 | 4,500 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,000 | 1,000 | 1,000 | 3,000 |
| Transactional Fees | | 2,000 | | 2,000 |
| Miscellaneous Expense | 750 | 750 | 750 | 2,250 |
| **Total Operating Disbursements** | 91,202 | 157,689 | 30,591 | 279,482 |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 13,000 | | 13,000 |
| **Total Other Disbursements** | 4,444 | 19,667 | 1,111 | 25,222 |
| **Total Disbursements** | 95,647 | 177,356 | 31,702 | 304,704 |
| | | | | |
| **Change for the Period** | 44,353 | (37,356) | 108,298 | 115,296 |
| Beginning Cash | 4,151 | 48,504 | 11,149 | 4,151 |
| Liquidity before DIP financing | 48,504 | 11,149 | 119,446 | 119,446 |
| DIP Financing - Borrowing | - | - | - | - |
| **Ending Cash** | 48,504 | 11,149 | 119,446 | 119,446 |

**Notes:**
1) This financial analysis is to be used for planning purposes only. These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy. These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates . True results may differ materially from planned with respect to census and PPD cost.

**SV Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week Total |
|---|---|---|---|---|
| | 1 | 2 | 3 | |
| **CASH RECEIPTS** | | | | |
| Collections | 180,000 | 180,000 | 180,000 | 540,000 |
| **Total Estimated Cash Receipts** | **180,000** | **180,000** | **180,000** | **540,000** |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 55,000 | 225,000 | | 280,000 |
| Supplies | 19,250 | 19,250 | 19,250 | 57,750 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 40,000 | | 40,000 |
| Union Dues/Healthcare/Pension | 9,000 | | | 9,000 |
| TM Management Fee | 14,538 | | 14,538 | 29,077 |
| Health and Family Services-Bed Tax | | | 31,000 | 31,000 |
| Rent | | | | |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 2,000 | 2,000 | 2,000 | 6,000 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,500 | 1,500 | 1,500 | 4,500 |
| Transactional Fees | | 3,000 | | 3,000 |
| Miscellaneous Expense | 1,000 | 1,000 | 1,000 | 3,000 |
| **Total Operating Disbursements** | **132,883** | **298,139** | **76,272** | **507,294** |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 24,000 | | 24,000 |
| **Total Other Disbursements** | **4,444** | **30,667** | **1,111** | **36,222** |
| **Total Disbursements** | **137,327** | **328,806** | **77,383** | **543,516** |
| | | | | |
| **Change for the Period** | **42,673** | **(148,806)** | **102,617** | **(3,516)** |
| Beginning Cash | 34,151 | 76,823 | 911 | 34,151 |
| | | | | |
| Liquidity before DIP financing | 76,823 | (71,982) | 103,528 | 30,635 |
| | | | | |
| DIP Financing - Borrowing | - | 72,893 | - | 72,893 |
| | | | | |
| **Ending Cash** | **76,823** | **911** | **103,528** | **103,528** |

**Notes:**
1) This financial analysis is to be used for planning purposes only. These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy. These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates . True results may differ materially from planned with respect to census and PPD cost.

**TN Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week Total |
|---|---|---|---|---|
| | 1 | 2 | 3 | |
| **CASH RECEIPTS** | | | | |
| Collections | 160,000 | 160,000 | 160,000 | 480,000 |
| **Total Estimated Cash Receipts** | 160,000 | 160,000 | 160,000 | 480,000 |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 35,000 | 135,000 | | 170,000 |
| Supplies | 21,900 | 21,900 | 21,900 | 65,700 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 62,000 | | 62,000 |
| Union Dues/Healthcare/Pension | 7,000 | | | 7,000 |
| TM Management Fee | 12,923 | | 12,923 | 25,846 |
| Health and Family Services-Bed Tax | | | 14,000 | 14,000 |
| Rent | | | | |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 1,500 | 1,500 | 1,500 | 4,500 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,000 | 1,000 | 1,000 | 3,000 |
| Transactional Fees | | 2,000 | | 2,000 |
| Miscellaneous Expense | 1,000 | 1,000 | 1,000 | 3,000 |
| **Total Operating Disbursements** | 110,917 | 230,789 | 59,306 | 401,013 |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 18,500 | | 18,500 |
| **Total Other Disbursements** | 4,444 | 25,167 | 1,111 | 30,722 |
| **Total Disbursements** | 115,362 | 255,956 | 60,417 | 431,735 |
| | | | | |
| **Change for the Period** | 44,638 | (95,956) | 99,583 | 48,265 |
| Beginning Cash | 19,151 | 63,789 | 1,000 | 19,151 |
| Liquidity before DIP financing | 63,789 | (32,167) | 100,583 | 67,416 |
| DIP Financing - Borrowing | - | 33,167 | - | 33,167 |
| **Ending Cash** | 63,789 | 1,000 | 100,583 | 100,583 |

Notes:
1) This financial analysis is to be used for planning purposes only.  These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy.  These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates . True results may differ materially from planned with respect to census and PPD cost.

**WCT Care, LLC**
**Cash Flow Projections**

| Week ending | 1/26/2019 | 2/2/2019 | 2/9/2019 | 3 Week Total |
|---|---|---|---|---|
| | 1 | 2 | 3 | |
| **CASH RECEIPTS** | | | | |
| Collections | 120,000 | 120,000 | 120,000 | 360,000 |
| **Total Estimated Cash Receipts** | 120,000 | 120,000 | 120,000 | 360,000 |
| | | | | |
| **CASH DISBURSEMENTS** | | | | |
| **Operating Disbursements** | | | | |
| Payroll | 30,000 | 130,000 | | 160,000 |
| Supplies | 7,350 | 7,350 | 7,350 | 22,050 |
| Insurance - Medical and Dental | 15,556 | 2,778 | 2,778 | 21,111 |
| Insurance - Liability | | 27,000 | | 27,000 |
| Union Dues/Healthcare/Pension | 7,000 | | | 7,000 |
| TM Management Fee | 9,692 | | 9,692 | 19,385 |
| Health and Family Services-Bed Tax | | | 18,000 | 18,000 |
| Rent | | | | |
| Utilities | 11,111 | 3,611 | 3,611 | 18,333 |
| Leases | 594 | | 594 | 1,189 |
| Facility compliance | 1,500 | 1,500 | 1,500 | 4,500 |
| Data processing | 3,333 | | | 3,333 |
| Maintenance | 1,000 | 1,000 | 1,000 | 3,000 |
| Transactional Fees | | 2,000 | | 2,000 |
| Miscellaneous Expense | 750 | 750 | 750 | 2,250 |
| **Total Operating Disbursements** | 87,887 | 175,989 | 45,276 | 309,151 |
| **Other Disbursements** | | | | |
| MidCap | 1,111 | 1,111 | 1,111 | 3,333 |
| DIP costs and fees | | | | |
| Professional fees | 3,333 | 5,556 | | 8,889 |
| Trustee Fees | | 15,000 | | 15,000 |
| **Total Other Disbursements** | 4,444 | 21,667 | 1,111 | 27,222 |
| **Total Disbursements** | 92,331 | 197,656 | 46,387 | 336,373 |
| | | | | |
| **Change for the Period** | 27,669 | (77,656) | 73,613 | 23,627 |
| Beginning Cash | 19,151 | 46,819 | 1,000 | 19,151 |
| Liquidity before DIP financing | 46,819 | (30,836) | 74,613 | 42,777 |
| DIP Financing - Borrowing | - | 31,836 | - | 31,836 |
| **Ending Cash** | 46,819 | 1,000 | 74,613 | 74,613 |

Notes:
1) This financial analysis is to be used for planning purposes only.  These are projections and as such make substantial use of estimates.
2) They are unaudited and there is no guarantee of material accuracy.  These are NOT GAAP.
3) This report is based upon PPD (Per Patient Day) estimates .  True results may differ materially from planned with respect to census and PPD cost.

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CC Care, et al.[1], | ) | Case No. 17-32406 |
| | ) | |
| Debtors. | ) | Judge Janet S. Baer |
| | ) | |
| _____ | ) | (Jointly Administered |

**INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN SECURED POST-
PETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY
CODE AND (II) SCHEDULING A FINAL HEARING**

Upon the motion (the "**Motion**") of the above-captioned debtors and the debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), for an order pursuant to section 364 of title 11 of the United States Code, 11 U.S.C. §§101, *et seq*, (the "**Bankruptcy Code**") and Rules 4001(b), 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the Northern District of Illinois (the "**Local Rules**"): (a) authorizing the Debtors, as borrowers, to obtain up to $1,500,000 in post-petition financing (the "**DIP Financing**") to be provided by 25 Capital Investment Holdings, LLC, as lender (the "**DIP Lender**"), pursuant to the terms and conditions of that Loan and Security Agreement, dated as of January 17, 2019 (the "**DIP Agreement**")[2] and the Note dated January 17, 2019 (the "**DIP Note**"), attached as exhibits to such Motion; (b) granting the DIP Lender security

---

[1] The Debtors in these Chapter 11 Cases are: CC Care, LLC (Case No.: 17-32406), BT Bourbonnais Care, LLC (Case No.: 17-32411), CT Care, LLC (Case No.: 17-32417), FT Care, LLC (Case No.: 17-32423), JT Care, LLC (Case No.: 17-32425), KT Care, LLC (Case No.: 17-32427), SV Care, LLC (Case No.: 17-32430), TN Care, LLC (Case No.: 17-32429), WCT Care, LLC (Case No.: 17-32433), JLM Financial Healthcare, LP (Case No.: 17-32421).

[2] Defined terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Agreement

interests in and to all of the Debtors' presently owned and after-acquired property to secure the Debtors' obligations in respect of such DIP Financing; (c) seeking a preliminary hearing on the Motion (the "**Preliminary Hearing**") to consider entry of an order authorizing the DIP Financing on an interim basis (the "**Interim DIP Order**"); and (d) requesting that a final hearing (the "**Final Hearing**") be scheduled to consider entry of an order authorizing the DIP Financing on a final basis (the "**Final DIP Order**"); due and sufficient notice of the Motion and Preliminary Hearing under the circumstances having been given; and the Preliminary Hearing on the Motion having been held before the Court on January 16, 2019; and upon the entire record made of Preliminary Hearing; and this Court having found good and sufficient cause appearing therefore,

THE COURT HEREBY FINDS AS FOLLOWS:

A.    Petition. On October 30, 2017 (the "**Petition Date**"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "**Bankruptcy Court**" or this "**Court**").

B.    Debtor-in-Possession Status; Appointment of Committee. The Debtors are continuing in the management and operation of their businesses and properties as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases. On November 15, 2017, the United States Trustee appointed an official committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "**Committee**").

C.    Notice. The Debtors have given due, appropriate and adequate notice of the Motion and the relief requested in the Motion, and such notice complies with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

2

D.    Jurisdiction and Venue.   Consideration of this Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (0). This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§157 and 1334.

E.    Use of Cash Collateral.   Pursuant to prior orders of the Court, including most recently that certain Eighteenth Interim Order (I) Authorizing the Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, (III) Scheduling Final Hearing and (IV) Granting Related Relief entered on January 11, 2019 (as such order is amended, revised, modified, or further extended on an interim or final basis by further order of the Bankruptcy Court, the **"Cash Collateral Order"**), the Debtors have been and remain authorized to continue using Cash Collateral (as defined in the Cash Collateral Order) in accordance with the terms and conditions of such Cash Collateral Order.  All provisions of the Cash Collateral Order remain in effect, enforceable and otherwise unaltered and unimpaired by entry of this Interim Order.

F.    Findings Regarding Postpetition Financing.

(i)    *Need for Postpetition Financing.*   The Debtors represent that notwithstanding their ability to use Cash Collateral as provided under the Cash Collateral Order, without the DIP Financing proposed by the Motion: (A) the Debtors will not have the funds necessary to make pay payroll for the week ending January 19, 2019 without immediate access of up to $550,000.00 of DIP Financing (the **"Initial Borrowing"**); (B) may lack sufficient resources to maintain their operations on a going concern basis through the Final Hearing without access to up to an additional $450,000.00 of DIP Financing (together with the Initial Borrowing, the **"Interim Borrowing"**); and (C) may lack sufficient resources to maintain their operations on a

3

going-concern basis and effectuate a possible global resolution of these Chapter 11 Cases over the next 90-120 days without access to the additional DIP Financing available under the terms and conditions of the DIP Agreement and DIP Note;

(ii)    As part of the efforts of the DIP Lender's affiliate, Laureate Ltd., to achieve a consensual and successful resolution of these Chapter 11 Cases within such time period, the DIP Lender is willing to make the DIP Financing available to the Debtors.

(iii)    As more particularly set forth in the DIP Agreement and addressed below and the Cash Collateral Order, the DIP Lender has agreed to provide the DIP Financing on a subordinated basis to the valid, perfected, prior liens and security interests held by (x) the Prepetition Agent or (y) any other party, including Edward Don & Company, whose liens were not avoidable as of the date of commencement of these Chapter 11 Cases (collectively, the "**Prior Liens**") in and to any of the same collateral that also secures the Debtors' Obligations under the DIP Agreement and DIP Note to the DIP Lender (the "**Shared Collateral**");

(iv)    *No Credit Available on More Favorable Terms.*    The Debtors represent that they are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a), (b) or (c)(1) of the Bankruptcy Code or secured credit pursuant to sections 364(c)(2) or (c)(3) of the Bankruptcy Code on terms more favorable than the DIP Agreement and DIP Note. Thus the DIP Financing offered by the DIP Lender under the DIP Agreement and DIP Note is the most favorable financing that is available to the Debtors;

(v)    *Business Judgment and Good Faith Pursuant to Section 364(e).*    The Debtors represent that the proposed DIP Financing is the product of vigorous and extensive negotiations between the Debtors and the DIP Lender and that the terms of the DIP Note and the DIP Agreement were negotiated in good faith and at arm's length. The terms of the DIP Financing

4

authorized by this Interim Order are fair and reasonable under the circumstances of these Chapter 11 Cases, reflect the exercise of prudent business judgment by the Debtors consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration. The DIP Lender is willing to make the DIP Financing available to the Debtors only on the terms set forth in the DIP Agreement and DIP Note and with the protections provided in this Interim Order and is relying in good faith, as that term is used in section 364(e) of the Bankruptcy Code. Thus, the DIP Lender is extending financing to the Debtors in good faith and the DIP Lender is entitled to the benefits of the provisions of section 364(e) of the Bankruptcy Code with respect to any DIP Financing it provides to the Debtor pursuant to this Interim Order; and

(vi)    *Good Cause, Immediate Entry.* The Debtors represent that the relief requested by the Motion pursuant to the terms of the DIP Note, DIP Agreement and this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates. The ability of the Debtors to maintain their business so they can preserve going concern value and continue to treat and service their patients at each of their facilities while the Debtors pursue a potential global resolution of these Chapter 11 Cases over the next few months depends upon the Debtors obtaining the relief requested by the Motion. Thus, good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Interim Order. [No party appearing in the Chapter 11 Cases has filed or made an objection to the relief sought in the Motion and the entry of this Interim Order, and] to the extent any objections were made (and not withdrawn prior to the entry of this Interim Order), such objections are overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor:

IT IS ORDERED, ADJUDGED AND DECREED, that:

1.    <u>Objections Overruled</u>. All objections (if any) to the entry of this Interim Order are resolved by the terms hereof or, to the extent not resolved, are overruled.

2.    <u>Interim Borrowing Authorization</u>. Pending the Final Hearing, the DIP Lender is authorized and empowered to immediately provide, and the Debtors are authorized and empowered to immediately borrow and obtain the Interim Borrowing in an amount up to $1,000,000.00, pursuant to the terms and conditions of the DIP Note and the DIP Agreement and this Interim Order. Copies of the DIP Note and the DIP Agreement approved by this Interim Order are attached hereto respectively as **Exhibit A** and **Exhibit B**.

3.    <u>Execution and Compliance with DIP Documents</u>. The Debtors are authorized and directed to execute, deliver, perform and comply with all of the terms and covenants of the DIP Note and the DIP Agreement, each of which constitute valid, binding, enforceable and non-avoidable obligations of the Debtors for all purposes during the Chapter 11 Cases, any subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of any Debtor's Chapter 11 Case or the liquidation of any Debtor's assets. The Debtors are authorized and directed to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Note and the DIP Agreement, as the DIP Lender may reasonably require as evidence of and for the protection of the obligations under the DIP Facility and the DIP Collateral or which may be otherwise deemed necessary by the DIP Lender to effectuate the terms and conditions of this Interim Order and the DIP Note, DIP Agreement and all additional documents, instruments, and agreements relating thereto being included in the definition of **"DIP Documents"** as used herein.

4.    <u>Use of Loan Proceeds</u>. The Debtors shall use the proceeds of the loans made by the DIP Lender pursuant to the DIP Documents and this Interim Order, as set forth in an Approved

6

Budget, to: (a) pay administrative expenses incurred in the Chapter 11 Cases; (b) provide for working capital and other general corporate purposes; and (c) to make any other payments permitted to be made by the Bankruptcy Code, in this Interim Order or in any other order of this Court to the extent provided for under the DIP Documents.

5.    **Conclusive Evidence of Obligations.**   The terms, conditions and covenants of the DIP Note and the DIP Agreement shall be sufficient and conclusive evidence of the borrowing and financing arrangements among the Debtors and the DIP Lender for all purposes.

6.    **Super-Priority Claim.**   For all obligations under the DIP Facility now existing or hereafter arising pursuant to the DIP Documents or this Interim Order, the DIP Lender is granted an allowed super-priority administrative claim of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code pursuant to section 364(c)(1) of the Bankruptcy Code, which claim shall have priority in right of payment over any and all other obligations, liabilities and Indebtedness of the Debtors, now in existence or hereafter incurred by any of the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, sections 364(c), 503(b) and 507(b) of the Bankruptcy Code (the **"Super-Priority Claim"**); *provided, however,* that the Super-Priority Claim shall be junior and subordinated in all respects to the Superpriority Claims (as such term is defined in the Cash Collateral Order) to the extent granted under the Cash Collateral Order in such amounts as determined by a final and non-appealable order of the Bankruptcy Court after notice and a hearing, *and provided further* that Lender's Super-Priority Claim shall not be recoverable from (i) the claims already raised in the adversary filed by the Committee in the Chapter 11 Cases that is pending as Adversary No. 18-00251 or (ii) chapter 5 avoidance actions against third-party, trade creditors that have continued to do business with the Debtors since the Petition Date.

7.   <u>The DIP Lender Lien Grant</u>.   Subject to the Prepetition Liens and Superpriority Claims of the Prepetition Agent and the AR Lenders under the Cash Collateral Order, to secure the prompt payment and performance of any and all obligations of the Debtors under the DIP Note, DIP Agreement and this Interim Order, the DIP Lender shall have, and is granted in accordance with the terms and conditions of the DIP Agreement and this Interim Order, effective on and after the date of entry of this Interim Order:

(a)   Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, perfected, enforceable and non-avoidable first priority liens on and security interests in all of the Collateral, as such term is defined in Section 2.8 of the DIP Agreement (other than any Shared Collateral, subject to the Prior Liens as provided in subpart (b) below) and any other DIP Collateral (as defined herein); and

(b)   Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable junior liens on and security interests in all Shared Collateral subject to the Prior Liens for so long as the obligations of the Debtors to any holder of such liens are outstanding.

8.   <u>DIP Collateral</u>.   The assets and property subject to the DIP Lender's liens and security interests approved by this Interim Order, include all of the Collateral as identified and described in Section 2.8 of the DIP Agreement (collectively, the **"DIP Collateral"**), including without limitation, all of the Debtors' claims and causes of action under Chapter 5 of the Bankruptcy Code belonging to any of the Debtors' estates under section 541 of the Bankruptcy Code, other than (i) the claims already raised in the adversary filed by the Committee in the Chapter 11 Cases that is pending as Adversary No. 18-00251; and (ii) chapter 5 avoidance actions against third-party, trade creditors that have continued to do business with the Debtors since the Petition

Date (the "**Chapter 5 Claims**"); *provided, however,* that the DIP Lender's Lien in the Chapter 5 Claims shall not attach or otherwise be enforceable until the entry of a Final DIP Order; *provided, further* that the DIP Lender, other than as may be necessary to preserve and maintain its lien on the Chapter 5 Claims, shall only enforce and liquidate its interests in such Chapter 5 Claims in the event any amounts remain due and owing to it after all other DIP Collateral consisting of any account receivables has been fully liquidated and distributed.  In no event shall: (a) any lien or security interest granted pursuant to the DIP Documents or this Interim Order be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (b) any person or entity who pays (or through the extension of credit to any Debtor, causes to be paid) any of the obligations under the DIP Facility be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted in favor of, or conferred upon, the DIP Lender by the terms of the DIP Documents or this Interim Order, until such time as all of the obligations under the DIP Facility are indefeasibly paid in full in cash in accordance with the DIP Agreement, DIP Note and this Interim Order; or (c) the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

9.  <u>Section 506(c) Claims/Other Relief at Final Hearing</u>.  At the Final Hearing, the Debtors shall seek that upon entry of the Final DIP Order: (a) no costs or expenses of administration shall be charged or asserted by the Debtors, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, against the DIP Lender, its claims or the DIP Collateral, without the prior written consent of the DIP Lender; (b) all rent that has accrued from the Petition Date through January 31, 2019, but which otherwise has not been paid as and to the extent required under the contractual terms of the unexpired real estate leases of the nine (9) facilities where the

Debtors have operated their facilities since the Petition Date shall be allowed in full (as calculated pursuant to the express provisions of such leases), as an administrative expense of the Chapter 11 Cases pursuant to sections 365(d)(3) and 503(b) of the Bankruptcy Code.; and (c) such Final DIP Order will include provisions and terms as may be necessary or appropriate to further address, document and other implement the DIP Lender's rights, claims and remedies following any Event of Default occurring under the DIP Documents.

10.    Lien Perfection. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all of the liens and security interests in and upon the DIP Collateral granted pursuant to this Interim Order and the DIP Documents, without the necessity of (a) filing, recording or serving any financing statements, mortgages, deeds of trust or other agreements, documents or instruments which may otherwise be required under federal or state law in any jurisdiction (collectively, the "**Lien Recording Documents**"), (b) taking possession of the DIP Collateral or evidence thereof (*provided, however,* that, without limiting the foregoing, any third party in possession of any DIP Collateral is hereby deemed a bailee for the benefit of and on behalf of the DIP Lender), or (c) taking any other action to validate or perfect the liens and security interests granted in this Interim Order, the DIP Agreement or any other DIP Document.  If the DIP Lender shall, in its discretion, elect for any reason to file any such Lien Recording Documents with respect to such liens and security interests, the Debtors are authorized and directed to execute, or cause to be executed, all such Lien Recording Documents upon the DIP Lender's request and the filing, recording or service thereof (as the case may be) of such Lien Recording Documents shall be deemed to have been made at the time of and on the Petition Date. The DIP Lender may, in its discretion, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have an interest in real or personal property and,

in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Interim Order. To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the liens and security interests authorized or created hereby, or otherwise would impose filing or registration requirements with respect thereto, such law is preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of this Court (*provided, however, that if the DIP Lender takes steps to perfect its Liens and security interests under otherwise applicable state law, it may do so without waiving the benefits of this provision of this Interim Order but subject in all circumstances to the subordination of the DIP Lender's Liens to any Prior Liens in Shared Collateral as provided herein*). In the event that any Lien Recording Document that the DIP Lender elects to file in accordance with this paragraph contains any limitations, defects, deficiencies or other information that might otherwise limit or adversely affect the DIP Lender's Liens upon and security interests in the DIP Collateral or any of the DIP Lender's claims, rights, priorities and/or protections afforded under this Interim Order, the DIP Credit Agreement or the DIP Promissory Note, such limitations, defects, deficiencies or other information shall not impair, limit, restrict or adversely affect in any way any of the DIP Lender's claims, rights, priorities and/or protections granted under this Interim Order, the DIP Agreement or any other DIP Document. Without limiting the generality of the other provisions of this Interim Order, nothing in this paragraph shall be deemed to prejudice, impair, adversely impact or otherwise alter the rights, claims and priorities of the Prepetition Agent or Edward Don in any of the Shared Collateral subject to a Prior Lien as provided for in this Interim Order or the Cash Collateral Order.

11.    <u>Nullifying Prepetition Restrictions on Postpetition Lien Grants</u>. Notwithstanding anything to the contrary contained in any prepetition agreement, contract, lease, document, note

or instrument to which any Debtor is a party or under which any Debtor is obligated, any provision (all such provisions being collectively referred to as the **"Restrictive Clauses"**) that restricts, limits or impairs in any way any Debtor's ability or right to grant liens or security interests upon any of the DIP Collateral (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Note, DIP Credit Agreement or this Interim Order or otherwise enter into and comply with all of the terms, conditions and provisions thereof shall not be effective and shall be unenforceable against any such Debtor and the DIP Lender to the maximum extent permitted under the Bankruptcy Code and other applicable law, but only with respect to the entry of this Interim Order granting such postpetition liens, security interests, claims, rights, priorities and/or protections or use of cash collateral to the DIP Lender pursuant to this Interim Order, the DIP Credit Agreement or the DIP Promissory Note, or any of the rights of the DIP Lender thereunder or to the maximum extent permitted under the Bankruptcy Code and other applicable law.

12.    <u>Collateral Rights</u>. Until all of the obligations under the DIP Facility shall have been indefeasibly paid and satisfied in full in immediately available funds and without further order of the Bankruptcy Court: in the event that any party who holds a lien or security interest in any of the DIP Collateral that is junior and/or subordinate to the liens and claims of the DIP Lender in such DIP Collateral receives or is paid proceeds of the DIP Collateral prior to the indefeasible payment and satisfaction in full of all Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold such DIP Collateral proceeds in trust for the DIP Lender and shall immediately turnover to the DIP Lender such proceeds for application to the obligations under the DIP Facility in accordance with the DIP Promissory Note, the DIP Credit Agreement, or this Interim Order; *provided, however,* that nothing herein shall be deemed to adversely impact or

12

otherwise alter the rights of either the Prepetition Agent or Edward Don as to any Shared Collateral subject to a Prior Lien that takes priority over the DIP Lender's Lien as provided by this Interim Order.

13.    Amendment to DIP Note.  The DIP Lender, with the consent of the Debtors, is authorized to amend and/or modify the DIP Note without further order of the Court; *provided* that any such amendments or modifications must be in writing and served upon counsel for the Committee, the U.S. Trustee and the Prepetition Agent two business days prior to such amendment becoming effective to the extent practicable under the circumstances; and *provided further* that any amendments or modifications that would have the effect of shortening the maturity date of the DIP Facility or increasing the Maximum Amount of borrowings permitted, or the aggregate fees payable, or the rate or amount of interest payable, under the DIP Note and the DIP Agreement shall be done only pursuant to further order of this Court.

14.    Stay Relief.  The automatic stay provided by section 362 of the Bankruptcy Code shall be, and hereby is, modified to the extent necessary to permit the DIP Lender to make the DIP Financing available and implement the DIP Facility under the terms of the DIP Documents and otherwise administer and enforce its rights, claims and remedies thereunder.  Without limiting the generality of the foregoing or any other or further rights of the DIP Lender following any Event of Default under the DIP Order as may be addressed at the Final Hearing and included in a Final DIP Order as referenced in paragraph 9 above, the automatic stay is hereby deemed lifted and modified by this Interim Order to the extent necessary to implement Section 7.1 of the DIP Agreement; *provided, however* that the relief granted by this paragraph is subject to the Prior Liens and Superpriority Claims of the Prepetition Agent and AR Lenders under the Cash Collateral Order.

15.    <u>Release Upon Repayment of Obligations</u>.  Upon the indefeasible payment in full of all obligations under the DIP Facility owed to the DIP Lender and termination of the DIP Agreement and/or cancellation of the DIP Note, the DIP Lender shall be released by each Debtor and its bankruptcy estate from any and all obligations, liabilities or responsibilities arising in connection with or related to this Interim Order, the DIP Credit Agreement and the DIP Note in accordance with the terms and conditions contained in the DIP Documents.

16.    <u>Restrictions on Additional Financing</u>.  All postpetition advances and other financial accommodations under the DIP Documents are made in reliance on this Interim Order and the Cash Collateral Order.  In the event that an order is entered at any time in the Chapter 11 Cases or in any subsequently converted case under chapter 7 of the Bankruptcy Code (other than the Final DIP Order or the Cash Collateral Order), which (a) authorizes the sale, lease, or other disposition of property of the Debtors' estates in which the DIP Lender has a lien or security interest, except as expressly permitted hereunder or in the DIP Note or DIP Agreement, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Lender holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Lender herein; then, in each instance described in clauses (a) and (b) of this paragraph, (i) the DIP Lender shall first have given its express prior written consent thereto, no such consent being implied from any other action, inaction or acquiescence by the DIP Lender or (ii) such other order shall require that all obligations under the DIP Facility first shall be indefeasibly paid in full in immediately available funds. The liens and security interests granted to or for the benefit of the DIP Lender hereunder and the rights of the DIP Lender pursuant to this Interim Order, the Cash Collateral Order and the DIP

14

Documents with respect to the obligations under the DIP Facility and the DIP Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or plan of liquidation of the Debtors and, if the DIP Lender shall expressly consent in writing that the obligations under the DIP Facility shall not be repaid in full upon confirmation and effectiveness thereof, shall continue after confirmation and effectiveness of any such plan.

17.    Binding Effect of Interim Order and DIP Note.  Subject to section 364(e) of the Bankruptcy Code, the provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered appointing a trustee in these Chapter 11 Cases, converting the Chapter 11 Cases to chapter 7 cases, appointing a chapter 7 trustee, dismissing any of the Debtors' bankruptcy cases (in the case of any such dismissal, to the maximum extent permitted under the Bankruptcy Code and other applicable law), or any order that may be entered confirming or consummating a plan of reorganization or plan of liquidation of the Debtors; and the terms and provisions of this Interim Order as well as the priorities in payment, liens, and security interests granted pursuant to this Interim Order, the DIP Agreement and the DIP Note shall continue in this or any superseding cases under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Interim Order until all obligations under the DIP Facility are indefeasibly paid and satisfied in full; *provided, however,* that except as otherwise provided in this Interim Order or in the DIP Documents, all obligations and duties of the DIP Lender hereunder, under the DIP Documents or otherwise with respect to any future loans and advances or otherwise shall terminate immediately as set forth in the DIP Agreement, unless the DIP Lender has given its express prior written consent thereto, no such consent being implied from any other action, inaction or acquiescence by the DIP Lender. Subject to section 364(e) of the Bankruptcy Code, the provisions of this Interim Order, the DIP

Agreement and the DIP Note shall be binding upon all parties-in-interest in the Chapter 11 Cases, including, without limitation, the Debtors, the DIP Lender, the Prepetition Agent, Edward Don and the Committee, and their respective successors and assigns (including, to the fullest extent permitted by applicable law, any chapter 7 trustee hereinafter appointed or elected for any Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the Debtors' estates).

18.   <u>Good Faith</u>.   The terms of the financing arrangements provided in the DIP Agreement and DIP Note have been negotiated in good faith among the Debtors and the DIP Lender, and any loans, advances or other financial accommodations which are made or caused to be made to the Debtors by the DIP Lender pursuant to any such DIP Documents are deemed to have been made and provided in good faith, as the term "good faith" is used in section 364(e) of the Bankruptcy Code, and the DIP Lender, including its successors and assigns, shall be entitled to the full protection of section 364 of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

19.   <u>Financing Term</u>.   Except as otherwise provided herein, the loans under the DIP Facility shall be available commencing on the date of this Interim Order and ending on the earlier to occur of the date (the "**Maturity Date**") that is May 31, 2019, the date on which the Debtors' ability to use Cash Collateral Order expires or is otherwise terminated pursuant to the terms of such order, or as otherwise provided in the DIP Agreement.

20.   <u>No Modification or Stay of Interim Order</u>.   If any or all of the provisions of this Interim Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect: (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to

the DIP Lender prior to the effective date of such modification, vacation or stay; or (b) the validity or enforceability of any security interest, lien, or priority authorized or created hereunder or pursuant to the DIP Note and the DIP Agreement, as applicable. Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtors to the DIP Lender prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order; and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations and/or liabilities. The indebtedness, obligations and/or liabilities of the Debtors to the DIP Lender under this Interim Order, the DIP Agreement, DIP Note and any other DIP Document shall not be discharged by the entry of an order confirming a plan of reorganization in the Debtors' bankruptcy cases pursuant to section 1141(d)(4) of the Bankruptcy Code or otherwise, unless and until all indebtedness, obligations and liabilities of the Debtors to the DIP Lender on account of the DIP Financing is indefeasibly paid in full in accordance with the terms and conditions of the DIP Note prior to or concurrently with the entry of such order. No indebtedness, obligation or liability owed by the Debtors to the DIP Lender under this Interim Order, the DIP Agreement or the DIP Note prior to the effective date of any modification, vacation or stay of this Interim Order can, as a result of any subsequent order in the Cases, or in any superseding case(s) be subordinated, lose its lien priority or super-priority administrative claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Interim Order, the DIP Credit Agreement and/or the DIP Note.

21.    No Control. In making decisions to make advances under the DIP Agreement and DIP Note pursuant to this Interim Order, the DIP Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "controlling person", "responsible person", or

17

"owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar federal or state statute).

22.    <u>No Third Party Beneficiaries</u>.   Nothing in this Interim Order or in the DIP Documents shall, or shall be deemed to, confer any benefits or rights upon any party or parties other than the Debtors and the DIP Lender.

23.    <u>Final Hearing</u>.  This matter is set for a Final Hearing at 1:00 p.m., prevailing Central Standard Time, on February 7, 2019, in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, to consider the entry of the Final DIP Order, at which time any party-in-interest may appear and present its objections to the Motion, or to the entry of the Final DIP Order.  A Notice of the Final Hearing, together with the proposed Final DIP Order and copy of this Interim Order shall be served  by the Debtors on or before January 21, 2019 on all parties entitled to notice in these Chapter 11 Cases.  Any objections to entry of the Final DIP Order shall be in writing and filed with the Clerk of this Court by no later than January 30, 2019 at 5:00 p.m., prevailing Central Standard Time (the "**Objection Deadline**"), with a copy of any such objection served so that it is actually received by counsel of record for the Debtors and the DIP Lender/Laureate on or before the Objection Deadline and otherwise timely served on all other parties entitled to notice in these Chapter 11 Cases in accordance with the applicable Bankruptcy Rules and Local Rules of this Court.

24.    <u>Conflicting Provisions</u>.  Unless otherwise provided in this Interim Order, to the extent the terms and conditions of the DIP Note, the DIP Agreement or Cash Collateral Order are

18

in conflict with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

25.    <u>Effectiveness</u>.  Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Interim Order shall (a) be immediately enforceable, and (b) not be stayed absent the grant of such stay under Bankruptcy Rule 8005 after a hearing upon notice to the Debtors and the DIP Lender.

26.    <u>Reservation of Rights</u>.  Notwithstanding anything to the contrary contained herein and except insofar as the authorization of (and the rights, claims and liens granted to the DIP Lender) with respect to the Interim Borrowing to the maximum extent provided in section 364(e) of the Bankruptcy Code, all parties reserve all rights with respect to the entry of the Final Order or any objections thereto, regardless of whether objections were raised by any such party at the time of the entry of this Interim Order.

DATE: January 17, 2019

ENTER:

Honorable Janet S. Baer
United States Bankruptcy Judge

19

# EXHIBIT A

## FORM OF NOTE
### (Debtor-in-Possession Loan and Security Agreement)

$1,500,000.00                                             Chicago, Illinois
January 17, 2019

FOR VALUE RECEIVED, the undersigned, BT BOURBONNAIS CARE, LLC, CC CARE, LLC, CT CARE, LLC, FT CARE, LLC, JT CARE, LLC, KT CARE, LLC, SV CARE, LLC, TN CARE, LLC, and WCT CARE, LLC, each a Delaware limited liability company and JLM FINANCIAL HEALTHCARE, LP, a Texas limited partnership (collectively, "**Maker**"), promises to pay to the order of 25 CAPITAL INVESTMENT HOLDINGS, LLC ("**Lender**"), the sum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00), or so much thereof as may have been advanced to the Maker, as provided under that certain Loan and Security Agreement dated as of the date hereof, between Maker and Lender, as the same may be amended, modified and/or restated from time to time (the "**Agreement**"), together with interest on the unpaid principal amount outstanding from time to time prior to maturity at the rates and at the times specified in the Agreement, and any other DIP Obligations owing by the undersigned under the Agreement, including pursuant to Section 9.11 thereof. Principal shall be repaid at the times and in the amounts set forth in the Agreement. The entire balance of principal and accrued interest shall be due and payable on the Maturity Date. Amounts due under this Note are secured by the Collateral pursuant to the Agreement.

All capitalized terms not specifically defined herein shall have the same meanings as in the Agreement. The principal of this Note is subject to prepayment in the manner and to the extent provided in the Agreement.

Maker and all guarantors and endorsers hereby waive presentment, demand, notice, protest, and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Note, and assent to extensions of the time of payment or forbearance or other indulgence without notice.

The laws of the State of Illinois shall govern the validity, construction, enforcement and interpretation of this Note.

[Remainder of Page Intentionally Left Blank]

730992715 18596849

730992715

Executed as of the date first above written.

**MAKER:**

JLM Financial Healthcare, LP, a Texas limited partnership

By: JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
    Carl L. Meyer, in his sole capacity as Manager and Designated Representative

730992715 18596849

730992715

BT Bourbonnais Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By: JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
　　　Carl L. Meyer, in his sole capacity as Manager

By: _____
　　　Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

CC Care, LLC, a Delaware limited liability company


By:   JLM Financial Healthcare, LP, a Texas limited
partnership, its sole member


By:  JLM Financial Investments 13, LLC, a Texas limited
liability company, its general partner


By: _____
      Carl L. Meyer, in his sole capacity as Manager


By: _____
      Jimmy Nassour, in his sole capacity as Manager


730992715 18596849

730992715

CT Care, LLC, a Delaware limited liability company


By:    JLM Financial Healthcare, LP, a Texas limited
partnership, its sole member


By:  JLM Financial Investments 13, LLC, a Texas limited
liability company, its general partner



By: _____
          Carl L. Meyer, in his sole capacity as Manager


By: _____
          Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

FT Care, LLC, a Delaware limited liability company


By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member


By:  JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner


By: _____

Carl L. Meyer, in his sole capacity as Manager


By: _____

Jimmy Nassour, in his sole capacity as Manager


730992715 18596849

730992715

**JT Care, LLC, a Delaware limited liability company**

By:   **JLM Financial Healthcare, LP, a Texas limited
partnership, its sole member**

By: **JLM Financial Investments 13, LLC, a Texas limited
liability company, its general partner**

By: _____

      Carl L. Meyer, in his sole capacity as Manager

By: _____

      Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

**KT Care, LLC, a Delaware limited liability company**

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:  JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
Carl L. Meyer, in his sole capacity as Manager

By: _____
Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

**SV Care, LLC, a Delaware limited liability company**

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
     Carl L. Meyer, in his sole capacity as Manager

By: _____
     Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

**TN Care, LLC, a Delaware limited liability company**

**By:** JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

**By:** JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

**By:** _____

Carl L. Meyer, in his sole capacity as Manager

**By:** _____

Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

WCT Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited
partnership, its sole member

By:  JLM Financial Investments 13, LLC, a Texas limited
liability company, its general partner

By: _____
    Carl L. Meyer, in his sole capacity as Manager

By: _____
    Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

# EXHIBIT B

U.S. $1,500,000.00

DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT

Dated as of

January 17, 2019

By and Among

BT BOURBONNAIS CARE, LLC, CC CARE, LLC, CT CARE, LLC, FT CARE, LLC,
JT CARE, LLC, KT CARE, LLC, SV CARE, LLC, TN CARE, LLC, and
WCT CARE, LLC, each a Delaware limited liability company,
and with JLM FINANCIAL HEALTHCARE, LP, a Texas limited partnership,
each as a Borrower and collectively as the Borrowers
and
25 CAPITAL INVESTMENT HOLDINGS, LLC,
as the Lender

730992715 18596849

730992715

# TABLE OF CONTENTS

**Page**

### ARTICLE I
### DEFINITIONS

| Section 1.1 | Certain Defined Terms | 2 |
| Section 1.2 | Other Terms | 10 |

### ARTICLE II
### THE LOANS

| Section 2.1 | The Loans | 10 |
| Section 2.2 | The Initial Borrowing and Subsequent Borrowings | 11 |
| Section 2.3 | Interest; Commitment Fee | 11 |
| Section 2.4 | Note | 11 |
| Section 2.5 | Repayment of the Loan | 11 |
| Section 2.6 | Acknowledgement as to Priority of Liens in any Shared Collateral | 12 |
| Section 2.7 | Payments and Computations, Etc | 12 |
| Section 2.8 | Grant of a Security Interest; Termination and Release | 12 |
| Section 2.9 | Evidence of Debt | 13 |

### ARTICLE III
### CONDITIONS PRECEDENT

| Section 3.1 | Conditions Precedent to Funding the Initial Borrowing | 13 |
| Section 3.2 | Conditions Precedent to Funding all Borrowings, including the Initial Borrowing | 14 |

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES

| Section 4.1 | Representations and Warranties of the Borrowers | 15 |

### ARTICLE V
### AFFIRMATIVE COVENANTS

| Section 5.1 | Maintenance of Facilities; Assets | 17 |
| Section 5.2 | Insurance | 17 |
| Section 5.3 | Compliance with Laws | 17 |
| Section 5.4 | Books and Records | 17 |

**TABLE OF CONTENTS**

(continued)

**Page**

| | | |
|---|---|---|
| Section 5.5 | Inspection Rights | 17 |
| Section 5.6 | Milestones | 18 |
| Section 5.7 | Approved Budget | 18 |
| Section 5.8 | Delivery of Approved Budget | 18 |

ARTICLE VI
NEGATIVE COVENANTS

| | | |
|---|---|---|
| Section 6.1 | Liens | 18 |
| Section 6.2 | Chapter 11 Claims | 19 |
| Section 6.3 | Amendments to the DIP Order | 19 |
| Section 6.4 | Budget Covenant | 20 |

ARTICLE VII
EVENTS OF DEFAULT

| | | |
|---|---|---|
| Section 7.1 | Events of Default | 20 |

ARTICLE VIII
SPECIFIC REGULATORY MATTERS

| | | |
|---|---|---|
| Section 8.1 | Representations and Warranties | 23 |
| Section 8.2 | Licensed Facilities | 27 |
| Section 8.3 | Healthcare Operations | 27 |
| Section 8.4 | Third Party Payor Programs | 28 |
| Section 8.5 | Cures | 28 |

ARTICLE IX
MISCELLANEOUS

| | | |
|---|---|---|
| Section 9.1 | Amendments and Waivers | 29 |
| Section 9.2 | Notices, Etc. | 29 |
| Section 9.3 | No Waiver; Remedies | 29 |
| Section 9.4 | Binding Effect; Assignability | 30 |
| Section 9.5 | GOVERNING LAW; JURY WAIVER; JURISDICTION | 30 |
| Section 9.6 | Execution in Counterparts; Severability; Integration | 30 |

# TABLE OF CONTENTS

### (continued)

**Page**

| | | |
|---|---|---|
| Section 9.7 | Tax Characterization | 31 |
| Section 9.8 | Survival of Representations | 31 |
| Section 9.9 | No Usury | 31 |
| Section 9.10 | Joint and Several Liability | 31 |
| Section 9.11 | Expenses; Indemnity; Damage Waiver | 31 |

## LIST OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| SCHEDULE I | Lender's Account |
| SCHEDULE II | Milestones |
| SCHEDULE III | Existing Liens |
| SCHEDULE IV | Specific Regulatory Disclosures |
| EXHIBIT A | Form of Notice of Borrowing and Officer's Certificate |
| EXHIBIT B | Form of Note |
| EXHIBIT C | Form of Compliance Certificate |

## PREAMBLE

This DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT is made as of January 17, 2019, by and among:

(1)   BT BOURBONNAIS CARE, LLC, CC CARE, LLC, CT CARE, LLC, FT CARE, LLC, JT CARE, LLC, KT CARE, LLC, SV CARE, LLC, TN CARE, LLC, and WCT CARE, LLC, each a Delaware limited liability company, and with JLM FINANCIAL HEALTHCARE, LP, a Texas limited partnership, as the borrower and each as a debtor and debtor-in-possession (each as a "Borrower" and collectively as the "Borrowers"); and

(2)   25 CAPITAL INVESTMENT HOLDINGS, LLC, as the lender (the "Lender").

## RECITALS

## WITNESSETH:

WHEREAS, on October 30, 2017 (the "Petition Date"), the Borrowers commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 to the United States Code, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court");

WHEREAS, prior to the Petition Date, the Prepetition Lenders (as defined below) provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of July 3, 2012 (as amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "Prepetition Credit Agreement"), among the Borrowers, MidCap Financial, LLC ("MidCap"), a Delaware limited liability company, as a lender, the lenders from time to time a party thereto (collectively, the "Prepetition Lenders") and MidCap Funding IV Trust (f/k/a MidCap Funding IV, LLC), as assignee of MidCap Financial Trust (f/k/a MidCap Financial, LLC) as successor administrative agent (the "Prepetition Agent");

WHEREAS, Laureate Ltd. "(Laureate)", an Affiliate of the Lender, is the assignee of mortgage loans owing by each Borrower's Lessor and also asserts direct and indirect claims against each Borrower;

WHEREAS, the Borrowers, the Lessors, the Lender, Laureate, and the Committee have discussed and wish to further pursue a possible global resolution of the Chapter 11 Cases and the mortgage loans owing by the Lessors to Laureate;

WHEREAS, the Borrowers expect to face liquidity needs during the near term while the parties pursue such a possible global resolution;

WHEREAS, the Lender is prepared to advance debtor-in-possession financing loans to the Borrowers to permit the Borrowers to attempt to address such liquidity needs, with the security interests and other liens securing the repayment of such financing being subordinate to

730992715 18596849

730992715

the liens of the Prepetition Lenders in any shared collateral, but only upon and subject to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.1   Certain Defined Terms. (a) Certain capitalized terms used throughout this Agreement are defined above or in this Section 1.1.

(b)   As used in this Agreement and schedules and exhibits thereto (each of which is hereby incorporated herein and made a part hereof), the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Account Debtor" means "account debtor", as defined in Article 9 of the UCC, and any other obligor in respect of an Account.

"Accounts" means, collectively, (a) any right to payment of a monetary obligation, whether or not earned by performance, (b) without duplication, any "account" (as defined in the UCC), any accounts receivable (whether in the form of payments for services rendered or goods sold, rents, license fees or otherwise), any "health-care-insurance receivables" (as defined in the UCC), any "payment intangibles" (as defined in the UCC) and all other rights to payment and/or reimbursement of every kind and description, whether or not earned by performance, (c) all accounts, "general intangibles" (as defined in the UCC), intellectual property, rights, remedies, guarantees, "supporting obligations" (as defined in the UCC), "letter-of-credit rights" (as defined in the UCC) and security interests in respect of the foregoing, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under the this Agreement and the Note in respect of the foregoing, (d) all information and data compiled or derived by any Borrower or to which any Borrower is entitled in respect of or related to the foregoing, and (e) all proceeds of any of the foregoing.

"Accrediting Organization" means any Person from which any Borrower has received an accreditation as of the Closing Date or thereafter.

"Affiliate" of any Person means any other Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person. For the purpose of this definition, "control" and the correlative meanings of the terms "controlled by" and "under common control with" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares or partnership interests or by contract or otherwise.

730992715 18596849                                    2

730992715

"Agreement" means this Loan and Security Agreement, as it may from time to time be amended, restated, supplemented or otherwise modified or replaced in accordance with the terms hereof.

"Approved Budget" means (i) the Initial Budget and (ii) each updated fourteen (14) week cash flow forecast to be delivered every week by the Borrowers to Lender pursuant to Section 5.8 to the extent that each such updated fourteen (14) week cash flow forecast is reasonably satisfactory in all material respects to the Lender in its sole discretion; provided, however, that no Approved Budget shall provide for any adequate protection payment for Mid-Cap Financial in excess of $10,000.00 per week.

"Bankruptcy Code" has the meaning set forth in the first recital paragraph hereto.

"Bankruptcy Court" has the meaning set forth in the first recital paragraph hereto.

"Borrower" and "Borrowers" means the entities described in the preamble hereto.

"Borrowing" means the Borrower receiving an advance of a portion of the Loan from the Lender under this Agreement.

"Business Day" means any day other than (i) a Saturday or Sunday or (ii) a day on which banking institutions in Florida, New York City, or Charlotte, North Carolina are authorized or obligated by law to be closed.

"Cash Collateral Order" means the Eighteenth Agreed Interim Order (I) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. §363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§361 and 363, and (III) Granting Related Relief Interim Cash Order, or any subsequently entered interim or Final Order entered by the Bankruptcy Court.

"Closing Date" means the later of (i) January 15, 2019 and (ii) one Business Day after the date of the entry of the Interim Order.

"Chapter 11 Cases" has the meaning set forth in the first recital paragraph hereto.

"CMS" means the federal Centers for Medicare and Medicaid Services (formerly the federal Health Care Financing Administration), and any successor Governmental Authority.

"Collateral" has the meaning set forth in Section 2.8(a).

"Committee" means, collectively, the official committee of unsecured creditors and any other committee formed, appointed or approved in any Chapter 11 Case.

"CON" means any certificate of need or similar license which determines that there is a need for a healthcare facility at a particular location or within a certain geographic region.

"Confirmation Order" means a final order of the Bankruptcy Court confirming the Plan under Section 1129 and related provisions of the Bankruptcy Code, in form and substance acceptable to the Lender in its sole discretion, that is in full force and effect and that has not been stayed, vacated, reversed, or rescinded, and any appeal (or motion for reconsideration) with respect thereto shall not have been timely filed and a stay of such order pending such appeal shall not be presently effective and that shall not otherwise be revised, modified, or amended without the prior written consent of the Lender given or not given in its sole discretion.

"Confirmed Plan" means the Plan as confirmed by the Confirmation Order.

"DIP Obligations" means all present and future indebtedness and other liabilities and obligations (howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, or due or to become due) of the Borrower to the Lender arising under this Agreement and the Note.

"DIP Order" means the Interim Order or Final Order, as applicable under the circumstances.

"Disclosure Statement" means a disclosure statement for the Plan that complies with the requirements of Section 1125 of the Bankruptcy Code, the Bankruptcy Rules, and Rule 3016-1 of the Local Rules of the Bankruptcy Court.

"Dollars" or "$" refers to lawful money of the United States of America.

"Equipment" means "equipment" as defined in Article 9 of the UCC.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Event of Default" has the meaning set forth in Section 7.1.

"Facility" means the facility leased by a Borrower from its Lessor that such Borrower operates as a skilled nursing facility and/or intermediate care facility.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be in form and substance

satisfactory to the Lender, in its sole discretion, and which order is in effect and not stayed, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Lender, in its sole discretion, which, among other matters but not by way of limitations, authorizes the Borrowers to obtain credit, incur (or guaranty) indebtedness and grant Liens under this Agreement and the Note, as the case may be, provides for the super priority of the Lender's claims and authorizes the use of cash collateral.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, consistently applied and as in effect from time to time.

"Global Resolution Term Sheet" means a non-binding term sheet, in form and substance acceptable to the Lender, that sets forth the terms and conditions and generally describes the mechanics for the resolution of the Chapter 11 Cases and the mortgage loans owed by the Lessors to Laureate.

"Governmental Account Debtor" means any Account Debtor that is a Governmental Authority, including, without limitation, Medicare and Medicaid.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"General Intangible" means any "general intangible" as defined in Article 9 of the UCC, and any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas or other minerals before extraction, but including payment intangibles and software.

"Healthcare Laws" means all applicable Laws relating to the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical or senior housing facilities (such as, but not limited to, nursing homes, skilled nursing facilities, rehabilitation hospitals, intermediate care facilities and adult care facilities), patient healthcare, patient healthcare information, patient abuse, the quality and adequacy of medical care, rate setting, equipment, personnel, operating policies, fee splitting, including, without limitation, (a) all federal and state fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute (42 U.S.C. §1320a-7b(6)), the Stark Law (42 U.S.C. §1395nn), the civil False Claims Act (31 U.S.C. §3729 et seq.), (b) TRICARE, (c) HIPAA, (d) Medicare, (e) Medicaid, (f) the Patient Protection and Affordable Care Act (P.L. 111-1468), (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152), (h) quality, safety and accreditation

730992715 18596849                         5

730992715

standards and requirements of all applicable state laws or regulatory bodies, (i) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (j) any and all other applicable health care laws, regulations, manual provisions, policies and administrative guidance, each of (a) through (j) as may be amended from time to time.

"Healthcare Permit" means a Permit (a) issued or required under Healthcare Laws applicable to the business of any Borrower or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Healthcare Laws applicable to the business of any Borrower, (b) issued by any Person from which any Borrower has, as of the Closing Date, received an accreditation, and/or (c) issued or required under Healthcare Laws applicable to the ownership or operation of any business location of a Borrower.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"HIPAA Compliant" shall mean that the applicable Person is in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could result in any of the foregoing or that could reasonably be expected to adversely affect such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by such Person of the provisions of HIPAA.

"Indemnitee" has the meaning set forth in Section 9.11(b).

"Initial Budget" means the forecast delivered on the Closing Date which reflects the Borrowers' anticipated cash receipts and anticipated disbursements for each calendar week during the period from January 13, 2019 through and including the end of the fourteenth (14th) calendar week ending on April 20, 2019, which shall be satisfactory to Lender in its sole discretion.

"Interim Order" means that certain interim order of the Bankruptcy Court entered in the Chapter 11 Cases (I) Authorizing Postpetition Secured Financing pursuant to 11 U.S.C. §§ 105(A), 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c).

"Inventory" means "inventory" as defined in Article 9 of the UCC.

"Laureate" has the meaning set forth in the third recital paragraph hereto.

730992715 18596849                                     6

730992715

"Laws" means, collectively, all international, foreign, United States federal and state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning set forth in the preamble hereto.

"Lessors" means BT Bourbonnais, LLC; CC Chicago, LLC; CT Crestwood, LLC; FT Frankfort, LLC; JT Joliet, LLC; KT Bourbonnais, LLC; SV Chicago, LLC; TN Waukegan, LLC; and WCT West Chicago, LLC.

"Lien" means (a) any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing) and (b) in the case of securities or Equity Interests, any purchase option, call or similar right of a third part with respect to such securities or Equity Interests.

"Lender's Account" means the account listed on Schedule I hereto.

"Loan" has the meaning set forth in Section 2.1.

"Maturity Date" means the earliest of (i) May 31, 2019, (ii) the date on which the Lender accelerates amounts due hereunder pursuant to Section 7.1, and (iii) the effective date of the Confirmed Plan.

"Maximum Amount" means $1,500,000.00.

"Medicaid" means the medical assistance programs administered by state agencies and approved by CMS pursuant to the terms of Title XIX of the Social Security Act, codified at 42 U.S.C. 1396 et seq.

"Medicare" means the program of health benefits for the aged and disabled administered by CMS pursuant to the terms of Title XVIII of the Social Security Act, codified at 42 U.S.C. 1395 et seq.

"MidCap" has the meaning set forth in the second recital paragraph hereto.

"Note" means the promissory note provided for in Section 2.4, as such promissory note may be amended, restated, reissued, extended or modified from time to time.

730992715 18596849                                        7

730992715

"Notice of Borrowing" has the meaning set forth in Section 2.2(b).

"Notice Period" has the meaning set forth in Section 7.1.

"Operator" means the singular or collective (as the context requires) reference to the following Persons:  (a) any Borrower that is properly licensed to operate a Facility, or is otherwise providing or furnishing goods or services, or is otherwise providing or furnishing goods or services (other than the mere leasing of a Facility as a lessor and the collection of rentals in connection therewith) from a Facility, and/or (b) any Person with whom a Borrower has contracted for management or other services for a Facility.

"Permits" means all governmental licenses, authorizations, provider numbers, supplier numbers, registrations, permits, drug or device authorizations and approvals, certificates, franchises, qualifications, accreditations, consents and approvals of a Borrower required under all applicable Laws and required for such Borrower in order to carry on its business as now conducted, including, without limitation, Healthcare Permits.

"Permitted Liens" has the meaning set forth in Section 6.1.

"Person" means an individual, partnership, corporation (including a business trust), limited liability company, joint stock company, trust, unincorporated association, joint venture, government (or any agency or political subdivision thereof) or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" means a joint plan of reorganization for the Borrowers, in form and substance acceptable to the Lender, that is consistent with and serves to implement the terms and conditions of the Global Resolution Term Sheet.

"Prepetition Agent" has the meaning set forth in the second recital paragraph hereto.

"Prepetition Credit Agreement" has the meaning set forth in the second recital paragraph hereto.

"Prepetition Lender" has the meaning set forth in the second recital paragraph hereto.

"Prepetition Liens" has the meaning set forth in Section 2.6.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Resident Agreements" means the singular or collective reference to all patient and resident care agreements, admission agreements and service agreements which include an occupancy agreement and all amendments, modifications or supplements thereto.

"Responsible Officer of the Borrowers" means any of _____, _____, or _____. Any document delivered hereunder that is signed by any of those Persons shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of the Borrowers and such Person shall be conclusively presumed to have acted on behalf of the Borrowers.

"Shared Collateral" has the meaning set forth in Section 2.6.

"Subsequent Borrowing" means a Borrowing that occurs on a Subsequent Borrowing Date.

"Subsequent Borrowing Date" means each Business Day occurring after the date of this Agreement on which the Borrower receives an additional Borrowing from the Lender.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which at least a majority of the shares of Voting Stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim" shall mean a claim against a Borrower in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, subject only to (i) any valid, non-avoidable and perfected Liens as of the Petition Date, and (ii) the Superpriority Claims (as defined in the Cash Collateral Order) of the Prepetition Agent, Laureate and Edward Don pursuant to the Cash Collateral Order in such amount as determined by a final and non-appealable Order of the Bankruptcy Court after notice and a hearing.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholdings), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Test Period" means (i) the four (4) calendar week period ending four (4) weeks after January 19, 2019 and (ii) thereafter, each rolling four (4) calendar week period ending four (4) weeks after the end of the preceding Test Period.

"Third Party Payor" means Medicare, Medicaid, TRICARE, and other state or federal health care program, Blue Cross and/or Blue Shield, private insurers, managed care plans and

any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"Third Party Payor Programs" means all payment and reimbursement programs, sponsored by a Third Party Payor, in which a Borrower participates.

"TRICARE" means the program administered pursuant to 10 U.S.C. Section 1071 et. seq), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"UCC" means the Uniform Commercial Code as from time to time in effect in the specified jurisdiction.

"Voting Stock" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

Section 1.2    Other Terms.  All terms used in Article 9 of the UCC in the state of Illinois, and not specifically defined herein, are used herein as defined in such Article 9.  With reference to this Agreement, the Note, and each other loan document, unless otherwise specified herein, the Note, or in such other loan document, the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein, the Note, or in any other loan document), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any loan document, shall be construed to refer to such loan document in its entirety and not to any particular provision thereof, (iv) all references in a loan document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the loan document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  Section headings herein and

730992715 18596849                                    10

730992715

in any other loan document are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other loan document.

## ARTICLE II

## THE LOANS

Section 2.1    The Loans.  On the terms and conditions hereinafter set forth, the Lender shall make loans (the "Loans") from time to time to the Borrowers secured by the Collateral during the period beginning on the date of this Agreement and ending on the Maturity Date. Amounts repaid may not be re-borrowed.

Section 2.2    The Initial Borrowing and Subsequent Borrowings.  (a) $550,000.00 of the Loan shall be advanced by the Lender to the Borrowers on the latest to occur of (i) the date of this Agreement, (ii) the date of the entry of the Interim Order, and (iii) January 17, 2019.

(b)    Subject to the terms and conditions of this Agreement, and unless such notice period is waived with respect to a particular Subsequent Borrowing by the Lender in its sole and absolute discretion, each Subsequent Borrowing shall be made on at least two (2) Business Days' notice from the Borrower to the Lender substantially in the form of Exhibit A hereto (any such notice, a "Notice of Borrowing"), provided that such Notice of Borrowing is received by the Lender no later than 2:00 P.M. (New York City time) on the Business Day of receipt; provided further, however, that the Borrowers may not request more than four Subsequent Borrowings in any four week period.  Any Notice of Borrowing received after 2:00 p.m. (New York City time) shall be deemed received prior to 2:00 P.M. (New York City time) on the following Business Day.  Each such Notice of Borrowing shall specify (A) the aggregate amount of such Subsequent Borrowing and (B) the date of such Subsequent Borrowing.  On the date of each Subsequent Borrowing, so long as the conditions precedent set forth in Section 3.2 shall have been satisfied or waived, including that no Event of Default shall have occurred and be continuing and that the effect of such Subsequent Borrowing would not cause the outstanding principal balance of the Loan to exceed the Maximum Amount on such date, the Lender shall make available to the Borrower, no later than 1:00 P.M. (New York City time), in same day funds, the amount of such Borrowing by payment into the account which the Borrower has designated in writing.

Section 2.3    Interest; Commitment Fee.  Each Borrower agrees to pay interest in respect of all unpaid principal amounts of the Loan from the respective dates such principal amounts are advanced until repaid (whether at the Maturity Date, on acceleration or otherwise) at a rate equal to eight percent (8%) per annum.  Upon the occurrence and during the continuance of an Event of Default, the Borrowers shall pay interest in respect of all unpaid principal amounts of the Loan at rate equal to the sum of (x) the rate described in the immediately preceding sentence plus (y) four percent (4%) per annum.  The Borrowers shall pay to the Lender a commitment fee of $60,000.00, which shall be fully earned and non-refundable upon the entry of the Final Order and shall be payable upon the Maturity Date.

730992715 18596849

11

730992715

Section 2.4    Note. The Borrowers shall execute and deliver to the Lender a promissory note payable to the Lender in the principal amount of $1,500,000.00, which promissory note shall be in the form of Exhibit B hereto (with blanks appropriately completed in conformity herewith).

Section 2.5    Repayment of the Loan. (a) The Loans, if not sooner paid, shall be due and finally payable in full on the Maturity Date unless extended pursuant to the Confirmed Plan. The Borrower finally may prepay all or any portion of the Loan at any time without premium or penalty.

(b)    Interest accrued on the Loan shall be due and payable in arrears on the Maturity Date unless extended pursuant to the Confirmed Plan.

(c)    Upon its receipt of funds, the Lender shall apply such funds as provided in this Agreement.

(d)    Notwithstanding anything contained in this Agreement to the contrary, absent the entry of a final and non-appealable Order from the Bankruptcy Court entered after notice and opportunity for a hearing at which the Bankruptcy Court determines the value of the AR Lender Priority Collateral exceeds the amounts owed to the Prepetition Lenders, no fees, expenses, principal and interest payable to Lender pursuant to this Agreement and the Note shall be paid from any portion of the Collateral (as such term is defined in the Prepetition Credit Agreement) until such time as the Obligations (as such term is defined in the Prepetition Credit Agreement) have been satisfied in an amount as allowed by an Order of the Bankruptcy Court, regardless of whether the Maturity Date has occurred.

Section 2.6    Acknowledgement as to Priority of Liens in any Shared Collateral. Notwithstanding anything to the contrary in this Agreement, for so long as any Obligations (as defined in the Prepetition Credit Agreement) are outstanding, the Liens granted in the Collateral to secure the repayment of the DIP Obligations of the Borrowers to the Lender under this Agreement shall be subordinate in priority to the Liens granted in the Collateral to secure the payment of all Obligations (as defined in the Prepetition Credit Agreement) (the "Prepetition Liens"), but only to the extent of any overlap in collateral (the "Shared Collateral") and to the extent that such Prepetition Liens in the Shared Collateral (other than the Prepetition Liens in favor of the Prepetition Agent) were valid, perfected, and non-avoidable as of the Petition Date.

Section 2.7    Payments and Computations, Etc. (a) All amounts to be paid or deposited by the Borrower hereunder shall be paid or deposited in accordance with the terms hereof on the day when due in lawful money of the United States of America in immediately available funds to the Lender's Account or such other account as is designated in writing by the Lender. All computations of interest hereunder shall be made on the basis of a year of 360 days for the actual number of days (including the first but excluding the last day) elapsed.

730992715 18596849                                        **12**

730992715

(b)     Whenever any payment hereunder shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest payable hereunder.

Section 2.8     <u>Grant of a Security Interest; Termination and Release</u>.  (a) Subject to the priorities set forth in <u>Section 2.6</u>, to secure the prompt and complete payment when due of the DIP Obligations pursuant to this Agreement and the Note and the performance by each Borrower of all of the obligations to be performed by it pursuant to this Agreement and the Note, each Borrower hereby assigns, pledges and grants to the Lender (and its successors and assigns) a security interest in all of such Borrower's assets and all property of such Borrower's bankruptcy estate under Section 541 of the Bankruptcy Code (the "<u>Collateral</u>"), including without limitation, all causes of action under Chapter 5 of the Bankruptcy Code and all of such Borrower's right, title and interest in and to the following, whether now owned or hereafter created, acquired or arising, and all proceeds and products of the following:

(i)     all goods, Accounts (including health-care insurance receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

(ii)     all of Borrowers' books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing;

provided, however, that the Lender's Lien in and to the Chapter 5 causes of action belonging to each such Borrower's bankruptcy estate under Section 541 of the Bankruptcy Code shall not attach or otherwise be enforceable until the entry of the Final Order, which shall provide that (A) the Lender's Lien shall not attach to Chapter 5 causes of action already raised in the adversary filed by the Committee in the Chapter 11 Cases that is pending as Adversary No. 18-00251 or as otherwise may exist against any third-party, trade creditors that have continued to do business with a Borrower since the Petition Date; and (B) the Lender (other than as necessary to preserve and maintain its Lien on such Chapter 5 causes of action), shall only enforce and liquidate its interests in such Chapter 5 causes of action in the event any amounts remain due and owing to Lender after all other DIP Collateral consisting of any account receivables has been fully liquidated and distributed.

(b)    Each Borrower shall not change its name, identity or corporate structure (or the equivalent) unless it (i) shall have received consent from the Lender (not to be unreasonably withheld) and (ii) shall have given the Lender at least thirty (30) days prior written notice thereof and shall have delivered to the Lender all UCC financing statements and amendments thereto as the Lender shall request and taken all other actions deemed necessary by the Lender to continue its perfected status in the Collateral with the same or better priority.

(c)    Each Borrower hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact (coupled with an interest) with full irrevocable power and authority in the place and stead of the Borrower and in the name of the Borrower or in its own name, from time to time in the Lender's discretion, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement.

(d)    Each Borrower will defend the Collateral against all claims and demands of all Persons (other than the claims and demands of the Prepetition Agent).

Section 2.9    <u>Evidence of Debt</u>.  The Lender shall maintain an account or accounts evidencing the indebtedness of the Borrowers to the Lender resulting from each Borrowing from time to time, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.  The entries made in such account(s) of the Lender shall be conclusive and binding for all purposes, absent manifest error.

## ARTICLE III

## <u>CONDITIONS PRECEDENT</u>

Section 3.1    <u>Conditions Precedent to Funding the Initial Borrowing</u>.  The initial Borrowing hereunder is subject to the satisfaction or waiver of the following conditions precedent:

(a)    The Lender shall have received (or waived receipt of) on or before the date of such Borrowing, each in form and substance reasonably satisfactory to the Lender, each of the following items:

(i)    This Agreement, duly executed and delivered by the parties hereto.

(ii)    The Note duly executed and delivered by the Borrower to the Lender in accordance with <u>Section 2.4</u>.

(iii)    A UCC-1 Financing Statement describing the Collateral as collateral and naming the Borrower as debtor and the Lender as secured party.

(iv)    Any other documents or certificates as reasonably requested by the Lender.

(b)    The Interim Order, in form and substance satisfactory to the Lender, shall have been entered by the Bankruptcy Court, after appropriate notice and opportunity for hearing.

(c)    Receipt by the Lender of certificates of and related endorsements of the Borrowers evidencing liability and casualty insurance.

(d)    The Borrowers and the Lender shall have agreed upon the initial Approved Budget.

Section 3.2    Conditions Precedent to Funding all Borrowings, including the Initial Borrowing.    Each Borrowing hereunder, including the initial Borrowing, is subject to the satisfaction or waiver of the following conditions precedent

(a)    The representations and warranties of the Borrowers contained in Articles IV and VIII, or which are contained in any document furnished at any time under or in connection herewith, shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein), except to the extent that such representations and warranties refer to an earlier date, in which case they shall be true and correct in all material respects (without duplication of any materiality qualifier contained therein) as of such earlier date.

(b)    No Event of Default shall have occurred and is continuing.

(c)    The Lender shall have received a Notice of Borrowing in accordance with the requirements hereunder.

(d)    Such Borrowing will not cause the outstanding principal balance of the Loans to exceed the Maximum Amount.

(e)    The DIP Order shall be in full force and effect and shall not have been (x) stayed, vacated, reversed or rescinded, and any appeal of such order shall not have been timely filed and a stay of such order pending appeal shall not be presently effective, and (y)(A) with respect to the Interim Order, without the prior written consent of the Lender, given or not given its sole discretion, revised, amended or modified or (B) with respect to the Final Order, without the prior written consent of the Lender, given or not given in its sole discretion, revised, amended or modified.

(f)    The Lender shall have received a certificate of a Responsible Officer of the Borrowers (substantially in the form of Exhibit C hereto) (and included as part of Notice of Borrowing), certifying compliance with the conditions precedent set forth in this Section 3.2.

730992715 18596849                          15

730992715

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of the Borrowers. Each Borrower hereby represents and warrants, as of the date hereof, and shall be deemed to represent and warrant on each Subsequent Borrowing Date, as follows:

(a)    The Borrower is an entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)    Subject to the entry of the DIP Order, the Borrower has the power, authority and legal right to make, deliver and perform this Agreement and the Note and all of the transactions contemplated hereby and thereby, and has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the Note. Subject to the entry of the DIP Order, this Agreement and the Note constitute the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with their terms, except as the enforceability hereof and thereof may be limited by the DIP Order. Subject to the entry of the DIP Order, no consent of any other party and no consent, license, approval or authorization of, or registration or declaration with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by the Borrower of this Agreement or the Note or the validity or enforceability of this Agreement or the Note.

(c)    The proper notice for (x) the motion seeking approval of this Agreement and the Note, the Interim Order and the Final Order, (y) the hearing for the approval of the Interim Order and (z) the hearing for the approval of the Final Order will be given. The Borrower shall give on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or the Final Order, as applicable.

(d)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, as applicable, the DIP Obligations will constitute allowed Superpriority Claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(1) of the Bankruptcy Code, other than the Superpriority Claims of the Prepetition Agent, Laureate and Edward Don pursuant to the Cash Collateral Order in such amounts as determined by Final Order of the Bankruptcy Court after notice and a hearing.

(e)    After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the DIP Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, subject, as to the priority only, to

(i) the Prepetition Liens in favor of the Prepetition Agent and (ii) Permitted Liens to the extent such Liens are otherwise valid, perfected, and non-avoidable.

(f)    The DIP Order is in full force and effect and has not been reversed, stayed, modified or amended without the Lender's consent.

(g)    The Approved Budget and all projected consolidated balance sheets, income statements and cash flow statements of Borrowers and their Subsidiaries delivered to the Lender were prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed in good faith by Borrowers to be reasonable in light of the conditions existing at the time of delivery of such report or projections (it being understood that any projections or estimates made in the items described in this subsection (g) are not to be viewed as facts and are subject to significant uncertainties and contingencies, that no assurance can be given that any such projections or estimates will be realized, that actual results may differ from projected results and such differences may be material).

(h)    Each of the Borrowers is in compliance in all material respects with the requirements of all Laws, including as to the licensing and operation of such Borrower's business, its facilities, and its operations, and all orders, writs, injunctions and decrees applicable to it, its operations, or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a material adverse effect on the operation of such Borrower's business or otherwise as to the value of its assets.

(i)    All information delivered to the Lender and pertaining to the financial condition of any Borrower fairly presents the financial position of such Borrower as of such date in conformity with GAAP (and as to unaudited financial statements, subject to normal year-end adjustments and the absence of footnote disclosures).  All information delivered to the Lender and pertaining to the financial, physical or other condition or aspect of the assets of any Borrower or of the facilities such Borrower leases is true, accurate, and complete in all material respects.

(j)    Each Borrower is the lawful owner of, has good and marketable title to and is in lawful possession of, or has a valid leasehold interests in, all material properties and other material assets (real or personal, tangible, intangible, or mixed) purported or reported to be owned or leased (as the case may be) by such Borrower.

## ARTICLE V

## AFFIRMATIVE COVENANTS

So long as any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no underlying claim has been asserted) the Borrowers shall, and shall cause each of the Subsidiaries to:

Section 5.1   Maintenance of Facilities; Assets.   Maintain, preserve and protect the Facilities, as well as their respective assets, ordinary wear and tear excepted.

Section 5.2   Insurance.   Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried under similar circumstances by such other Persons and providing for not less than 30 days' prior notice to the Lender of termination, lapse or cancellation of such insurance (or, in the case of non-payment of premiums, 10 days).

Section 5.3   Compliance with Laws.   Comply in all material respects with the requirements of all Laws, including as to the licensing and operation of such Borrower's business, its facilities, and its operations and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a material adverse effect on the operation of such Borrower's business or otherwise as to the value of its assets.

Section 5.4   Books and Records.   Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Borrower or such Subsidiary, as the case may be.

Section 5.5   Inspection Rights.   Permit representatives and independent contractors of the Lender to visit and inspect such Borrower's facilities, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its officers, its management company representatives, and its independent public accountants at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to such Borrower; provided, however, that when an Event of Default exists the Lender (or any of its respective representatives or independent contractors) may do any of the foregoing at the expense of Borrower at any time during normal business hours and without advance notice.

730992715 18596849                                    18

730992715

Section 5.6    <u>Milestones</u>. Comply with the milestones set forth in Schedule II (the "<u>Milestones</u>"), unless extended or waived by the Lender.

Section 5.7    <u>Approved Budget</u>. (a) The use of Loans and other credit extensions by the Borrowers under this Agreement shall be in compliance with the Approved Budget and necessary to fund operating expenses of the Borrowers. Lender (i) may assume that the Borrowers will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget. The line items in the Approved Budget for payment of interest, expenses and other amounts to the Lender are estimates only, and the Borrowers remain obligated to pay any and all DIP Obligations in accordance with the terms of this Agreement, the Note and the DIP Order regardless of whether such amounts exceed such estimates. Nothing in any Approved Budget shall constitute an amendment or other modification of this Agreement or the Note or any of the borrowing restrictions or other lending limits set forth therein.

Section 5.8    <u>Delivery of Approved Budget, Etc</u>. The Borrowers shall, no less than weekly, on or before 5:00 p.m. New York, New York time on the fourth Business Day of each fiscal week (which deadline may be extended with the consent of the Lender) deliver to the Lender, the Committee and the Prepetition Agent (to the extent that the Obligations, as such term is defined in the Prepetition Credit Agreement, remain outstanding) an updated fourteen-week cash flow forecast for the succeeding fourteen-week period, which cash flow forecast, upon approval by the Lender in its sole discretion, shall become the Approved Budget. By the same deadline each fiscal week (which deadline may be extended with the consent of the Lender), the Borrowers shall deliver to the Lender, the Committee and the Prepetition Agent (to the extent the Obligations, as such term is defined in the Prepetition Credit Agreement, remain outstanding), substantially in the form of <u>Exhibit C</u> hereto, (i) a certificate of a Responsible Officer setting forth the reconciliation of budgeted versus actual revenues and expenses for the prior fiscal week and (ii) where the pertinent fiscal week follows the end of any Test Period, a certificate of a Responsible Officer setting forth the calculation as to whether the Borrowers are in compliance with the covenants set forth in Section 6.4 for such Test Period.

**ARTICLE VI**

**NEGATIVE COVENANTS**

So long as any Loan or other Obligation hereunder shall remain unpaid or unsatisfied (other than contingent indemnification obligations for which no underlying claim has been asserted), no Borrower shall, nor shall it permit any Subsidiary to, directly or indirectly:

Section 6.1    <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following (collectively "<u>Permitted Liens</u>"):

(a)     Liens pursuant to this Agreement;

(b)     The Prepetition Liens;

(c)     Liens, including any judgment Liens, existing or asserted on the Closing Date and listed on Schedule III;

(d)     normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(e)     Liens for Taxes not yet due or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP; and

(f)     statutory or common law Liens arising in connection with landlords, carriers, warehousemen, mechanics, suppliers, materialmen or repairmen and other similarly situated Persons imposed by applicable law that are not avoidable pursuant to Section 545 of the Bankruptcy Code and that, in each case, arise in the ordinary course of business which secure amounts not overdue for a period of more than thirty (30) days and do not materially detract from the value of the Collateral.

Section 6.2   Chapter 11 Claims.

(a)     Except in each case for the Prepetition Credit Agreement, incur, create, assume, suffer to exist or permit any other super priority claim or Lien on any Collateral which is pari passu with or senior to the DIP Obligations (or the Liens securing the DIP Obligations) hereunder or adequate protection Liens or claims of the Prepetition Agent and Prepetition Lenders against the Borrowers.

(b)     File an application for approval of any Superpriority Claim or Lien in any of the Chapter 11 Cases that is pari passu with or senior to the DIP Obligations (or the Liens securing the DIP Obligations) hereunder, Liens securing the obligations under the Prepetition Credit Agreement or any Liens granted by the Bankruptcy Court to the Prepetition Agent on behalf of itself and the Prepetition Lenders as adequate protection of the Prepetition Agent's Liens without the consent of the Lender.

(c)     Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Lender with respect to this Agreement or the Note, the transactions contemplated hereby or thereby, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby.

(d)     Make (i) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (ii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in

730992715 18596849                              20

730992715

each case in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court after notice and a hearing and (b) are expressly permitted by the terms of this Agreement and the Note and within the limits of the Approved Budget.

Section 6.3   <u>Amendments to the DIP Order</u>.  Amend, supplement or otherwise modify the DIP Order without the written consent of the Lender, in its sole discretion.

Section 6.4   <u>Budget Covenant</u>.

(a)   As of the last day of each Test Period, permit the actual total receipts for the line item constituting "Total Revenue" in the Approved Budget to be less than 85% of the aggregate budgeted amount of such line item as set forth in the Approved Budget for such Test Period; and

(b)   As of the last day of each Test Period, permit the actual amount of disbursements for the line items in the budget labeled "Payroll/Benefits," "Operating Costs," "Restructuring Costs," and "CapEx" in the Approved Budget (excluding fees and expenses of the professionals for the Borrowers, the Lender, and the Prepetition Lenders) to be more than 115% of the budgeted amount of such line item as set forth in the Approved Budget for such Test Period.

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.1   <u>Events of Default</u>.  If any of the following events (each, an "<u>Event of Default</u>") shall occur:

(a)   any representation or warranty made or deemed to be made by the Borrower under this Agreement shall prove to be false or incorrect in any material respect and such event shall remain unremedied for ten (10) Business Days;

(b)   (i) the Borrower shall fail to perform or observe any term or agreement (other than described in the following clause (ii)) hereunder in any material respect and such event shall remain unremedied for two (2) Business Days after receipt from the Lender of written notice of such failure, or (ii) the Borrower shall fail to make any payment or deposit to be made by it when due hereunder and such event shall remain unremedied for five (5) Business Days; or

(c)   there shall have occurred any of the following in any Chapter 11 Case:

(i)   the first Business Day that is twenty-five (25) days (which may be extended by up to two (2) Business Days to accommodate the Bankruptcy Court's calendar and availability) after the entry of the Interim Order (unless such date is extended by Lender) if the Final Order has not been entered by the Bankruptcy Court on or before such date;

(ii)      the failure of any Borrower to (i) comply with any provision of the DIP Order, including, without limitation, any reporting obligation thereunder; or (ii) comply with any other covenant or agreement specified in the DIP Order;

(iii)      the inability of the Borrowers to continue to use cash collateral, whether as the result of a default under any existing cash collateral order or otherwise;

(iv)      the Borrowers' grant, create, incur or suffer to exist any postpetition liens or security interests other than those granted pursuant to the DIP Order and other Permitted Liens;

(v)      the entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(vi)      the entry of an order in any of the Chapter 11 Cases appointing a chapter 11 trustee or an examiner with expanded powers;

(vii)      any application by any Borrower seeking an order of any court or entry of order of any court granting to any party other than the Lender a Lien or security interest in or against assets that constitute Collateral that is senior or equal to the Liens and security interests granted under the DIP Order to Lender, or to the Prepetition Liens, or any priority of the liens or security interests securing the DIP Obligations, being contested by the Borrower in any jurisdiction;

(viii)      prior to repayment in full, in cash, of the DIP Obligations, the Borrowers make any payment of principal or interest or otherwise on account of any indebtedness or payables other than any payment (i) with respect to the DIP Obligations or (ii) in accordance with the Approved Budget;

(ix)      prior to repayment in full, in cash, of the DIP Obligations, the Borrowers make any motion or application for the incurrence of any postpetition financing unless the proceeds thereof shall be used to repay in full, in cash all outstanding DIP Obligations;

(x)      the entry of an order in any of the Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property with a value in excess of $100,000 in the aggregate, including the Collateral pledged pursuant to this Agreement or the DIP Order, of any Borrower or to commence or continue any prepetition litigation against any Debtor involving potential liability not covered by insurance, in excess of $100,000 in the aggregate;

(xi)      the entry of any non-monetary judgment or order against any Borrower with respect to a post-petition event which does or would reasonably be

expected to (i) cause an adverse change in the financial condition, business, prospects, operations or assets of any Borrower or (ii) have an adverse effect on the rights and remedies of the Lender under this Agreement or the DIP Order, and a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect;

(xii)    the DIP Order being amended or modified in any manner, or the filing of a motion or proceeding requesting authority to enter into such amendment or modification, without the consent of the Lender;

(xiii)    the Borrowers' use, or their support of any other party in interest's use, of any portion of the Collateral to challenge (i) the validity, perfection, priority, extent or enforceability of this Agreement, or (ii) the security interests and liens on assets of the Borrowers securing the DIP Obligations;

(xiv)    the Borrowers' support of any investigation or assertion of any claims against the Lender, Laureate, or any of their respective Affiliates;

(xv)    the Borrowers file a motion for entry of order approving bidding procedures for the sale of all, substantially all, or a portion of the Borrowers' assets, and certain deadlines related to any sale process, or the Bankruptcy Court enters any such order, that is not in form and substance acceptable to the Lender;

(xvi)    the Borrowers file a motion for entry of order approving the sale of all, substantially all, or a portion of the Borrowers' assets, or the Bankruptcy Court enters any such order, that is not in form and substance acceptable to the Lender;

(xvii)    without the consent of the Lender, the filing or confirmation of any plan in the Chapter 11 Cases that is inconsistent in any material respect with the terms and conditions set forth in the Global Resolution Term Sheet; or

(xviii)    any Milestone is not timely achieved;

then, by providing three (3) Business Days' notice (the "Notice Period") to the Borrowers, the Prepetition Agent, and the Committee, the Lender in its sole discretion, may (x) declare the Loan and all interest accrued on the Loan and any other DIP Obligations to be immediately due and payable (and the Borrowers shall pay the Loan and all such amounts and DIP Obligations immediately) and (y) further terminate this Agreement and the Note as to any future liability or obligation of the Borrowers, but without affecting any of the Lender's Liens in the Collateral and without affecting the DIP Obligations.  In addition, upon any such declaration, the Lender shall have, in addition to all other rights and remedies under this Agreement or otherwise, all other rights and remedies provided under the UCC of the applicable jurisdiction and other applicable laws, which rights shall be cumulative. Notwithstanding anything contained in this Section 7.1 to the contrary, absent the entry of a final and non-appealable Order from the Bankruptcy Court

entered after notice and opportunity for a hearing at which the Bankruptcy Court determined the value of the AR Lender Priority Collateral exceeds the amounts owed to the Prepetition Lenders, no fees, expenses, principal and interest payable to Lender pursuant to this Agreement and the Note shall be paid from any portion of the Collateral (as such term is defined in the Prepetition Credit Agreement) until such time as the Obligations (as such term is defined in the Prepetition Credit Agreement) have been satisfied in an amount as allowed by an Order of the Bankruptcy Court, regardless of whether the Maturity Date has occurred.

None of the Collateral or the application of the proceeds of the Collateral (in connection with any voluntary or mandatory prepayment, exercise of remedy or otherwise) shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine. Upon termination of the Notice Period, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated without further notice or order of the Bankruptcy Court, unless the Lender elects otherwise in a written notice to the Borrowers, the Prepetition Agent, and the Committee shall be permitted to exercise all rights and remedies, including with respect to the Collateral, set forth in the DIP Order and this Agreement and the Note, and as otherwise available at law without further order or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Bankruptcy Code sections 362 or 105 or otherwise. In the event that any party requests a hearing seeking to prevent the Lender from exercising any of their rights and remedies that arise after an Event of Default, the sole issue before the Bankruptcy Court at such hearing shall be whether an event of default has occurred and has not been cured. No other issue or argument shall be relevant to any opposition to enforcement of the Lender.

## ARTICLE VIII

### SPECIFIC REGULATORY MATTERS

Section 8.1    Representations and Warranties.   To induce the Lender to enter into this Agreement and to make the loans contemplated hereby, Borrowers hereby represent and warrant that, except as disclosed in Schedule IV, the following statements are true, complete and correct as of the date hereof, and Borrowers hereby covenant and agree to notify the Lender within three (3) Business Days (but in any event prior to Borrowers submitting any Notice of Borrowing) following the occurrence of any facts, events or circumstances known to a Borrower, whether threatened, existing or pending, that would make any of the following representations and warranties untrue, incomplete or incorrect and shall provide to the Lender within two (2) Business Days of the Lender's request, such additional information as the Lender shall request regarding such disclosure:

(a)     Healthcare Permits.  Borrowers have (i) each Healthcare Permit and other rights from, and have made all declarations and filings with, all applicable Governmental Authorities, all self regulatory authorities and all courts and other tribunals necessary to engage in the ownership, management and operation of the Facilities or the assets of any Borrower, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any

730992715

such Healthcare Permit. All such Healthcare Permits are valid and in full force and effect and Borrowers are in material compliance with the terms and conditions of all such Healthcare Permits, except where failure to be in such compliance or for a Healthcare Permit to be valid and in full force and effect would not have a material adverse effect.

(b)    Specific Licensing. Each Facility is duly licensed as skilled nursing facility and/or an intermediate care facility under the applicable laws of the State of Illinois. Borrowers have not granted to any third party the right to reduce the number of licensed beds, persons served or units in the Facilities or the right to apply for approval to move any and all of the licensed beds, persons served or units in the Facilities to any other location and there are no proceedings or contemplated to reduce the number of licensed beds, persons served or units in the Facilities.

(c)    Resident Agreements. The Resident Agreements comply with all applicable Laws, including Healthcare Laws. Any revisions to or extension of any Resident Agreement shall require prior Bankruptcy Court approval.

(d)    Accreditation. Borrowers have received and maintain accreditation in good standing and without impairment by all applicable Accrediting Organizations, to the extent required by law (including any equivalent regulation). No Borrower or manager has received any notice or communication from any Accrediting Organization that a Facility is (i) subject to or is required to file a plan of correction with respect to any accreditation survey, or (ii) in danger of losing its accreditation due to a failure to comply with a plan of correction.

(e)    Participation Agreements/Provider Status/Cost Reports.

(i)    There is no investigation, audit, claim review, or other action pending or, to the knowledge of any Borrower, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third Party Payor participation agreement or provider number or other Healthcare Permit or result in a Borrower's exclusion from any Third Party Payor Program, nor has any Third Party Payor Program made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit related to any Facility, nor have the Borrowers made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to any Facility.

(ii)    The Borrowers, and, to the knowledge of the Borrowers, their contractors, have properly and legally billed all intermediaries and Third Party Payors for services rendered with respect to the Facilities and have maintained their records to reflect such billing practices.

(iii)    Borrowers have the requisite participation agreement or provider number or other Healthcare Permit to bill the Medicare program and the respective Medicaid programs in the State of Illinois (to the extent such Borrower participates in the Medicare or Medicaid program in such state) and all other Third Party Payor Programs (including, without limitation, Medicare) which have historically accounted for any portion of the revenues of such Facility.

(iv)    All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by the Borrowers are and will be materially accurate and complete and have not been and will not be misleading in any material respects.

(f)    <u>No Violation of Healthcare Laws.</u>

(i)    None of the Facilities, the Borrowers or any manager are in violation of any Healthcare Laws, except where any such violation would not have a material adverse effect.

(ii)    Borrowers are HIPAA Compliant.

(iii)    No Facility has received a statement of deficiencies or survey violation of a "Level A" (or equivalent) or worse (with respect to assisted living facilities), or a tag level of "G" or higher with respect to any skilled nursing facility within the past three years for which a plan of correction has not been filed with the applicable state authority. No Facility is currently subject to any plan of correction that has not been accepted by or is currently the subject of a review by the applicable state authority. No Borrower has received notice of any charges of patient abuse.

(g)    <u>Proceedings.</u> No Borrower nor any Facility is subject to any proceeding, suit or, to Borrowers' knowledge, investigation by any federal, state or local government or quasi-governmental body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services): (i) which may result in the imposition of a fine, alternative, interim or final sanction, a lower reimbursement rate for services rendered to eligible patients which has not been provided for on their respective financial statements, or which would have a material adverse effect on any Borrower or the operation of any individual Facility; (ii) which could result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or Healthcare Permits of any Facility; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by a Borrower; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by any Borrower (including, without limitation, any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports;

730992715 18596849                                   26

730992715

(h)   Ancillary Laws.  Borrowers have received no notice, and are not aware, of any violation of applicable antitrust laws or employment laws of any federal, state or local government or quasi-governmental body, agency, board or other authority with respect to the Facilities or the Borrowers.

(i)   Hill-Burton.  No Borrower is or will be a participant in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the advance of federal funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).

(j)   Fraud and Abuse.

(i)   No Borrower or manager has, or to its knowledge has been threatened to have, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in manager or any Borrower has, engaged in any of the following:  (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment under any Healthcare Laws; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Healthcare Laws; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any Healthcare Laws on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (I) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Healthcare Laws, or (II) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Healthcare Laws; (E) presenting or causing to be presented a claim for reimbursement for services that is for an item or services that was known or should have been known to be (I) not provided as claimed, or (II) false or fraudulent; or (F) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (I) a Facility in order that the Facility may qualify for Governmental Authority certification, or (II) information required to be provided under 42 U.S.C. § 1320a-3.  All contractual arrangements to which Borrower is a party are in compliance with all Healthcare Laws.

(ii)　　No Borrower or manager has been, or to its knowledge has been threatened to be, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in manager or any Borrower:  (A) has had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or is the subject of a proceeding seeking to assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable laws or regulations; (C) has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty; (D) has been involved or named in a U.S. Attorney complaint made or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729-3731 or qui tam action brought pursuant to 31 U.S.C. §3729 et seq.; (E) has been made a party to any other action by any governmental authority that may prohibit it from selling products to any governmental or other purchaser pursuant to any law; or (F) was or has become subject to any federal, state, local governmental or private payor civil or criminal investigations or inquiries, proceedings, validation review, program integrity review or statement of charges involving and/or related to its compliance with Healthcare Laws or involving or threatening its participation in Medicare, Medicaid or other Third Party Payor Programs or its billing practices with respect thereto.

Section 8.2　　<u>Licensed Facilities</u>.

(a)　　<u>Certificates of Need</u>.

(i)　　If required under applicable Healthcare Laws, Borrower has and shall maintain in full force and effect a valid CON for no less than the number of beds and units in the applicable Facility as of the date of this Agreement.  Borrower shall maintain any applicable CON free from restrictions or known conflicts which would materially impair the use or operation of the applicable Facility for its current use, and shall not permit any CON to become provisional, probationary or restricted in any way.

(ii)　　No Borrower shall do (or suffer to be done by any Borrower or any Affiliate of any Borrower) any of the following without the Lender's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed:

(A)　　Replace or transfer all or any part of any Facility's units or beds to another site or location; or

(B)      Transfer or demise any CON or other Healthcare Permit or rights thereunder to any Person or to any location other than the Facility to which such CON or Healthcare Permit pertains.

(b)      Manager. Borrowers shall not (i) change the manager of any Facility or make any modification, amendment, termination or cancellation of the pertinent management agreement, (ii) enter into any other agreement relating to the management or operation of any Facility with such manager or any other Person, (iii) consent to the assignment by such manager of its interest under the management agreement, or (iv) waive or release any of its rights and remedies under the pertinent management agreement, in each case, without both the prior written consent of the Lender given or withheld in Lender's sole and absolute discretion and an Order of the Bankruptcy Court. Such restrictions and approval rights are solely for the purposes of assuring that the Facilities are managed and operated in a first-class manner consistent with Healthcare Laws and the preservation and protection of the Facilities as security for the DIP Obligations and shall not place responsibility for the control, care, management or repair of the Facilities upon the Lender, or make the Lender responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Facilities.

Section 8.3      Healthcare Operations.

(a)      Borrowers will, with respect to the Facilities:

(i)      timely file or caused to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, Permit renewals and reports of every kind whatsoever required by Healthcare Laws (which reports will be materially accurate and complete in all respects and not misleading in any respect and shall not remain open or unsettled); and

(ii)      timely file or caused to be timely filed (after giving effect to any extension duly obtained), all cost reports required by Healthcare Laws, which reports shall be materially accurate and complete in all respects and not misleading in any material respect and which shall not remain open or unsettled, except in accordance with applicable settlement appeals procedures that are timely and diligently pursued and except for any processing delays of any Governmental Authority.

(b)      Borrowers will maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Facility for its current use, all Healthcare Permits necessary under Healthcare Laws to carry on the business of Borrowers as it is conducted on the Closing Date.

(c)      Borrowers will at all times be, and cause all managers to be, HIPAA Compliant.

(d)      If any Facility is currently accredited by an Accrediting Organization, Borrowers will (i) maintain such accreditation in good standing and without limitation or impairment, (ii)

730992715 18596849                                29

730992715

promptly submit to the Accrediting Organization a plan of correction for any deficiencies listed on any accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such accreditation.

Section 8.4    <u>Third Party Payor Programs</u>.  Neither the Facilities, nor any Borrower, shall, other than in the ordinary course of business, change the terms of any Third Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including, without limitation, the amount and timing of finance charges, fees and write-offs). Borrowers will (a) maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Facility for its current use, all Healthcare Permits necessary under Healthcare Laws to continue to receive reimbursement under all Third Party Payor Programs in which any Borrower or any Facility participates as of the date of this Agreement, and (b) provide to the Lender upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Borrowers. Borrowers shall at all times comply with all requirements, contracts, conditions and stipulations applicable to Borrowers in order to maintain in good standing and without default or limitation all such participation agreements.

Section 8.5    <u>Cures</u>.  If there shall occur any fact, event or circumstance for which Borrowers are required to give the Lender notice under <u>Section 8.1</u> above after the Closing Date, Borrowers shall take such action as is necessary to validly challenge or otherwise appropriately respond to such fact, event or circumstance within any timeframe required by applicable Healthcare Laws, and shall thereafter diligently pursue the same to a favorable conclusion, all to the effect that the fact, event or circumstance giving rise to Borrowers' notice obligation under <u>Section 8.1</u> shall be dismissed, rescinded, eliminated and otherwise cease to exist on that date which is the earlier to occur of (a) sixty (60) days after the date any Borrower or any of its Affiliates became aware of such fact, event or circumstance, or (b) the expiration of any cure period given under applicable Healthcare Laws; *provided, however,* that Borrowers will not permit to exist or occur any fact, event or circumstance which could cause any representation or warranty in the following subsections of <u>Section 8.1</u> to be untrue, incomplete or incorrect or which could trigger an disclosure obligation under such subsections of <u>Section 8.1</u>:  (a), (b), (e)(i), (h), and (j).

# ARTICLE IX

## <u>MISCELLANEOUS</u>

Section 9.1    <u>Amendments and Waivers</u>.  (a)  No amendment or modification of any provision of this Agreement shall be effective without the written agreement of the Borrower and the Lender, and no termination or waiver of any provision of this Agreement or consent to any departure therefrom by the Borrower shall be effective without the written concurrence of the

730992715 18596849                                   30

730992715

Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 9.2    Notices, Etc.    Any report, demand, notice or other communication required or permitted to be given hereunder shall be in writing, and shall be delivered by (i) facsimile or, (ii) a recognized overnight national courier service (such as FedEx) for next Business Day delivery, in each case to the parties at the addresses set forth under its name on the signature pages hereof (or to such other addresses as any party may specify by due notice to the other). Any notice delivered to a party's designated address by (a) recognized overnight national courier service shall be deemed to have been received by such party at the time the notice is delivered to such party's designated address.

Section 9.3    No Waiver; Remedies.    No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law. For avoidance of doubt, nothing contained herein shall obligate the Lender to exercise any remedy hereunder upon the occurrence of any Event of Default or, in lieu of such exercise, preclude the Lender from exercising any other remedy under applicable law, including the Bankruptcy Code, including, without limitation, to seek specific performance or other relief under or with respect to the DIP Order or any other Order of the Bankruptcy Court.

Section 9.4    Binding Effect; Assignability.    (a) This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lender and their respective successors and permitted assigns. This Agreement and the Lender's rights and obligations hereunder and interest herein shall be assignable in whole or in part (including by way of the sale of participation interests therein) by the Lender and its successors and assigns (i) with the written consent of the Borrower not to be unreasonably withheld, or (ii) if such and assignment is to an Affiliate of the Lender, without the consent of the Borrower. The Borrower may not assign any of its rights and obligations hereunder or any interest herein without the prior written consent of the Lender.

Section 9.5    GOVERNING LAW; JURY WAIVER; JURISDICTION.    (a) THIS AGREEMENT SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF ILLINOIS.

(b)    EACH OF THE PARTIES HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING DIRECTLY OR INDIRECTLY OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREUNDER.

730992715 18596849                                    31

730992715

(c)      EACH PARTY EXECUTING THIS AGREEMENT (I) AGREES THAT ANY SUIT, ACTION OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT (OR, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, A COURT OF RECORD IN COOK COUNTY, ILLINOIS OR IN THE COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE NORTHERN DISTRICT OF ILLINOIS), (II) SUBJECT TO THE LAST SENTENCE OF THIS SUBSECTION, CONSENTS TO THE JURISDICTION OF EACH SUCH COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING, AND (III) WAIVES ANY OBJECTION WHICH THEY MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY OF SUCH COURTS AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.   THE LENDER HEREBY CONSENTS TO THE AUTHORITY OF THE BANKRUPTCY COURT TO ENTER THE FINAL ORDER, BUT DOES NOT CONSENT (AND EXPRESSLY RESERVES ALL OF ITS RIGHTS TO OBJECT) TO THE AUTHORITY OF THE BANKRUPTCY COURT TO ENTER ANY OTHER FINAL JUDGMENT OR ORDER AS TO THE LENDER, WHETHER RELATING TO THIS AGREEMENT OR OTHERWISE.

Section 9.6      Execution in Counterparts; Severability; Integration.   This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.   Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement.   In the event that any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.   This Agreement contains the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings.

Section 9.7      Tax Characterization.   Notwithstanding any provision of this Agreement, the parties hereto intend that the Loan advanced hereunder shall constitute indebtedness for United States of America federal income tax purposes.

Section 9.8      Survival of Representations.   All representations and warranties made herein shall survive the making of the Loan hereunder and the delivery of the Note, and shall continue in full force and effect so long as any DIP Obligations are outstanding, there exists any commitment by the Lender to the Borrower, and until this Agreement is formally terminated in writing.

730992715

Section 9.9    <u>No Usury</u>.  Regardless of any other provision of this Agreement or the Note, if for any reason the effective interest should exceed the maximum lawful interest, the effective interest shall be deemed reduced to, and shall be, such maximum lawful interest.

Section 9.10    <u>Joint and Several Liability</u>.  The obligations of each Borrower set forth in this Agreement or the Note shall be the joint and several obligations of the Borrowers.  Each Borrower acknowledges and agrees that (i) Lender shall not be required first to initiate any suit or to exhaust its remedies against any Borrower or any other Person, or against any of the Collateral in order to enforce this Agreement and that, notwithstanding the occurrence of any of the foregoing, each Borrower shall be and remain directly and unconditionally liable to Lender for all sums due under this Agreement and the Note and (ii) subject to the terms of this Agreement, when pursuing its rights and remedies under this Agreement or the Note against any Borrower, Lender may, but shall be under no obligation to, pursue such rights and remedies under this Agreement against any Borrower or any other Person or against any of the Collateral, and any failure by Lender to pursue such other rights or remedies or to collect any payments from such other Borrower or any such other Person to realize upon any Collateral, or any release of such Borrower or any such other Person or any such Collateral, shall not relieve such Borrower of any liability under this Agreement or the Note, and shall not impair or affect the rights and remedies, express or implied, or as a matter of applicable law, of Lender against the Borrowers.  Each reference to "Borrower" in this Agreement and the Note shall be construed to mean a joint and several reference to the Borrowers.

Section 9.11    <u>Expenses; Indemnity; Damage Waiver</u>.  (a)  The Borrowers shall pay (i) all reasonable out-of-pocket expenses incurred by the Lender (including the reasonable fees, charges and disbursements of its counsel) in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other loan documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Lender (including the fees, charges and disbursements of its counsel) in connection with the enforcement or protection of its rights (A) in connection with this Agreement, the Note, and the other loan documents, including its rights under this Section, or (B) in connection with Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    The Borrowers shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrowers arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, the Note, any other loan document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or the administration of this

730992715 18596849                                    33

730992715

Agreement, the Note, and the other loan documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by any Borrower, or any environmental liability related in any way to any Borrower, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrowers or any of such Borrower's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrowers against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other loan document, if the Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     To the fullest extent permitted by applicable law, the Borrowers shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the Note, any other loan document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

(d)     The agreements in this Section shall survive the termination of any loan commitment and the repayment, satisfaction or discharge of all the other DIP Obligations.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

730992715 18596849                    34

730992715

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

THE BORROWERS:

JLM Financial Healthcare, LP, a Texas limited partnership

By: JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner


By: _____
Carl L. Meyer, in his sole capacity as Manager and Designated Representative


BT Bourbonnais Care, LLC, a Delaware limited liability company

By: JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By: JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner


By: _____
Carl L. Meyer, in his sole capacity as Manager


By: _____
Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

CC Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
       Carl L. Meyer, in his sole capacity as Manager

By: _____
       Jimmy Nassour, in his sole capacity as Manager

CT Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
       Carl L. Meyer, in his sole capacity as Manager

By: _____
       Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

FT Care, LLC, a Delaware limited liability company

By:  JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:  JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
       Carl L. Meyer, in his sole capacity as Manager

By: _____
       Jimmy Nassour, in his sole capacity as Manager

JT Care, LLC, a Delaware limited liability company

By:  JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:  JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
       Carl L. Meyer, in his sole capacity as Manager

By: _____
       Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

KT Care, LLC, a Delaware limited liability company


By:  JLM Financial Healthcare, LP, a Texas limited partnership, its sole member


By:  JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner


By: _____
Carl L. Meyer, in his sole capacity as Manager


By: _____
Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

SV Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
      Carl L. Meyer, in his sole capacity as Manager

By: _____
      Jimmy Nassour, in his sole capacity as Manager

730092715 18596849

730092715

TN Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
      Carl L. Meyer, in his sole capacity as Manager

By: _____
      Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

WCT Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
       Carl L. Meyer, in his sole capacity as Manager

By: _____
       Jimmy Nassour, in his sole capacity as Manager

Address for all Borrowers:

c/o JLM Financial Investments
3839 Bee Caves Road, Suite 205
Austin, TX  78746
Attn:  Jimmy Nassour
Phone:  512-583-0055
Facsimile:  512-583-0054
E-Mail:  jimmy@Jimmynassour.com

730992715 18596849

730992715

THE LENDER:                          25 CAPITAL INVESTMENT HOLDINGS, LLC

                                     By:_____
                                          Name:
                                          Title:


                                     Address for the Lender:

                                     25 Capital Investment Holdings, LLC
                                     13024 Ballantyne Corporate Place
                                     Suite 425
                                     Charlotte, NC  28277
                                     Attn:  Christopher LaBate
                                     E-Mail: Christopher.labate@25capital.com

730992715 18596849

730992715

## SCHEDULE I

### Lender's Account

### Separately Provided to Borrowers

Schedule I to Loan and Security Agreement

## SCHEDULE II

### MILESTONES

### Milestones

- No later than January 31, 2019, the Borrowers, the Lessors, the Committee, Laureate, and the Lender shall have entered into the Global Resolution Term Sheet.

- No later than fifty (50) days after the entry of the Interim Order, the Borrowers shall have filed the Plan, as well as the Disclosure Statement, with the Bankruptcy Court.

- No later than thirty (30) days after the filing of the Plan and the Disclosure Statement, the Bankruptcy Court shall have entered an Order approving the Disclosure Statement, authorizing the solicitation of acceptances of the Plan, and scheduling a confirmation hearing on the Plan.

- No later than forty-five (45) days after the entry of the Order approving the Disclosure Statement, the confirmation hearing shall have been held and the Confirmation Order shall have been entered.

- No later than May 31, 2019, the Confirmed Plan shall have become effective.

## SCHEDULE III

### EXISTING LIENS

### NONE

Schedule III to Loan and Security Agreement

## SCHEDULE IV

## SPECIFIC REGULATORY DISCLOSURES

## NONE

## EXHIBIT A

**FORM OF
NOTICE OF BORROWING
AND OFFICER'S CERTIFICATE**

Date: _____, ___, 2019

TO:   25 Capital Investment Holdings, LLC

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of January ___, 2019 (as amended, restated, extended, supplemented, or otherwise modified in writing from time to time, the "Agreement"), among BT Bourbonnais Care, LLC, CC Care, LLC, CT Care, LLC, FT Care, LLC, JT Care, LLC, KT Care, LLC, SV Care, LLC, TN Care, LLC, WCT Care, LLC, and JLM Financial Healthcare, LP, each as a "Borrower" and collectively, as the "Borrowers", and 25 Capital Investment Holdings, LLC, as the "Lender". Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed thereto in the Agreement.

The Borrowers hereby request a Subsequent Borrowing of Loans on _____ ___, 2019 **[as least two (2) Business Days from date of letter]** in the amount of $_____.

The Subsequent Borrower requested herein complies with the requirements of Section 2.2(b) of the Agreement.

Each Borrower hereby certifies that the conditions precedent set forth in Section 3.2 of the Agreement applicable to the requested Subsequent Borrowing shall be satisfied on and as of the date of such Subsequent Borrowing.

BT Bourbonnais Care, LLC, CC Care, LLC,
CT Care, LLC, FT Care, LLC, JT Care, LLC,
KT Care, LLC, SV Care, LLC, TN Care, LLC,
WCT Care, LLC, and JLM Financial Healthcare,
LP

By: _____
Name: _____
Title: **Responsible Officer**

## EXHIBIT B

### FORM OF NOTE
#### (Debtor-in-Possession Loan and Security Agreement)

$1,500,000.00

Chicago, Illinois
January 17, 2019

FOR VALUE RECEIVED, the undersigned, BT BOURBONNAIS CARE, LLC, CC CARE, LLC, CT CARE, LLC, FT CARE, LLC, JT CARE, LLC, KT CARE, LLC, SV CARE, LLC, TN CARE, LLC, and WCT CARE, LLC, each a Delaware limited liability company and JLM FINANCIAL HEALTHCARE, LP, a Texas limited partnership (collectively, "**Maker**"), promises to pay to the order of 25 CAPITAL INVESTMENT HOLDINGS, LLC ("**Lender**"), the sum of One Million Five Hundred Thousand and 00/100 Dollars ($1,500,000.00), or so much thereof as may have been advanced to the Maker, as provided under that certain Loan and Security Agreement dated as of the date hereof, between Maker and Lender, as the same may be amended, modified and/or restated from time to time (the "**Agreement**"), together with interest on the unpaid principal amount outstanding from time to time prior to maturity at the rates and at the times specified in the Agreement, and any other DIP Obligations owing by the undersigned under the Agreement, including pursuant to Section 9.11 thereof. Principal shall be repaid at the times and in the amounts set forth in the Agreement. The entire balance of principal and accrued interest shall be due and payable on the Maturity Date. Amounts due under this Note are secured by the Collateral pursuant to the Agreement.

All capitalized terms not specifically defined herein shall have the same meanings as in the Agreement. The principal of this Note is subject to prepayment in the manner and to the extent provided in the Agreement.

Maker and all guarantors and endorsers hereby waive presentment, demand, notice, protest, and all other demands and notices in connection with the delivery, acceptance, performance and enforcement of this Note, and assent to extensions of the time of payment or forbearance or other indulgence without notice.

The laws of the State of Illinois shall govern the validity, construction, enforcement and interpretation of this Note.

[Remainder of Page Intentionally Left Blank]

730992715 18596849

730992715

Exhibit B to Loan and Security Agreement

Executed as of the date first above written.

**MAKER:**

JLM Financial Healthcare, LP, a Texas limited partnership

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
    Carl L. Meyer, in his sole capacity as Manager and Designated Representative

BT Bourbonnais Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
    Carl L. Meyer, in his sole capacity as Manager

By: _____
    Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

Exhibit B to Loan and Security Agreement

CC Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
    Carl L. Meyer, in his sole capacity as Manager

By: _____
    Jimmy Nassour, in his sole capacity as Manager

CT Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
    Carl L. Meyer, in his sole capacity as Manager

By: _____
    Jimmy Nassour, in his sole capacity as Manager

FT Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
      Carl L. Meyer, in his sole capacity as Manager

By: _____
      Jimmy Nassour, in his sole capacity as Manager

JT Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
      Carl L. Meyer, in his sole capacity as Manager

By: _____
      Jimmy Nassour, in his sole capacity as Manager

Exhibit B to Loan and Security Agreement

**KT Care, LLC, a Delaware limited liability company**

By:  JLM Financial Healthcare, LP, a Texas limited
partnership, its sole member

By:  JLM Financial Investments 13, LLC, a Texas
limited liability company, its general partner

By: _____
        Carl L. Meyer, in his sole capacity as Manager

By: _____
        Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

Exhibit B to Loan and Security Agreement

SV Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
Carl L. Meyer, in his sole capacity as Manager

By: _____
Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

Exhibit B to Loan and Security Agreement

TN Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
      Carl L. Meyer, in his sole capacity as Manager

By: _____
      Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

Exhibit B to Loan and Security Agreement

WCT Care, LLC, a Delaware limited liability company

By:   JLM Financial Healthcare, LP, a Texas limited partnership, its sole member

By:   JLM Financial Investments 13, LLC, a Texas limited liability company, its general partner

By: _____
    Carl L. Meyer, in his sole capacity as Manager

By: _____
    Jimmy Nassour, in his sole capacity as Manager

730992715 18596849

730992715

Exhibit B to Loan and Security Agreement

## EXHIBIT C

**FORM OF
COMPLIANCE CERTIFICATE**

Date: _____, __, 2019

TO:   25 Capital Investment Holdings, LLC

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement, dated as of January __, 2019 (as amended, restated, extended, supplemented, or otherwise modified in writing from time to time, the "Agreement"), among BT Bourbonnais Care, LLC, CC Care, LLC, CT Care, LLC, FT Care, LLC, JT Care, LLC, KT Care, LLC, SV Care, LLC, TN Care, LLC, WCT Care, LLC, and JLM Financial Healthcare, LP, each as a "Borrower" and collectively, as the "Borrowers", and 25 Capital Investment Holdings, LLC, as the "Lender".  Capitalized terms used, but not otherwise defined, herein shall have the same meanings ascribed thereto in the Agreement.

*[Use following paragraph for weekly budget reconciliations]*

1. Attached hereto as Schedule __ is the reconciliation, with respect to the current Approved Budget, of the budgeted versus actual revenues and expenses of the Borrowers for the fiscal week ending _____ __, 2019 **[the immediately prior fiscal weeks]**.

*[Use following paragraph for calculations as to whether the Borrowers are in compliance with the covenants of Section 6.4 of the Agreement for the applicable Test Period]*

1. Attached hereto as Schedule __ is a calculation as to whether the Borrowers are in compliance with the covenants of Section 6.4 of the Agreement for the Test Period ending _____ __, 2019.  As set forth on such Schedule, the Borrowers [were] [were not] in compliance with such covenants for such Test Period in that **[describe]**.

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate as of the date first written above.

BT Bourbonnais Care, LLC, CC Care, LLC,
CT Care, LLC, FT Care, LLC, JT Care, LLC,
KT Care, LLC, SV Care, LLC, TN Care, LLC,
WCT Care, LLC, and JLM Financial Healthcare,
LP


By: _____

Name: _____

Title:  Responsible Officer


730992715 18596849

730992715

Exhibit C to Loan and Security Agreement